(No. 67903.—

*In re* ESTATE OF SIDNEY GREENSPAN, a Disabled Person (Patrick T. Murphy, Public Guardian of Cook County and Guardian of the Person of Sidney Greenspan, Appellant, v. Andrew R. Gelman, Guardian *ad litem* for Sidney Greenspan, Appellee).

*Opinion filed July 9, 1990.—Rehearing denied August 22, 1990.*

CLARK, J., took no part.
WARD, J., joined by CALVO, J., dissenting.

Patrick T. Murphy and Rebecca S. Kolleng, of the Office of the Public Guardian of Cook County, of Chicago, for appellant.

Andrew R. Gelman, of McBride, Baker & Coles, of Chicago, appellee *pro se.*

Duane D. Young, of Springfield, and James Bopp, Jr., Thomas J. Marzen, Mary M. Nimz, Daniel Avila, Teresa Kealy and Joel M. Barkow, of Indianapolis, Indiana, for *amicus curiae* Ethics and Advocacy Task Force of the Nursing Home Action Group.

Kirk B. Johnson, Edward B. Hirshfeld and Terrie A. Rymer, of Chicago, and Jack R. Bierig, Carter G. Phillips, Mark E. Haddad and Joseph R. Guerra, of Sidley & Austin, of Washington, DC, for *amicus curiae* American Medical Association.

Clarke D. Forsythe and Paul Benjamin Linton, of Chicago, for *amicus curiae* Americans United for Life Legal Defense Fund.

Walter M. Weber and C. Peter Thomas S. Cornell, of New Hope, Kentucky, for *amicus curiae* Free Speech Advocates.

Lawrence R. Samuels, of Ross & Hardies, of Chicago, and Fenella Rouse and M. Rose Gasner (Richard Wasserman, of Zavin, Sinnreich & Wasserman, of counsel), of New York, New York, for *amicus curiae* Society for the Right to Die, Inc.

Edward R. Grant, of Chicago, for *amici curiae* American Academy of Medical Ethics *et al.*

JUSTICE STAMOS delivered the opinion of the court:

In this cause, Patrick T. Murphy, as public guardian of Cook County and guardian of the person of Sidney

Greenspan, appeals from denial by the circuit court of Cook County of his petition for leave to order the discontinuance of artificial feeding and hydration of Mr. Greenspan. We vacate and remand.

On October 5, 1988, upon petition by the public guardian, the circuit court appointed him as plenary guardian of the person of Mr. Greenspan. The public guardian's petition to terminate Mr. Greenspan's life-support systems was filed on October 11, 1988, and on October 12 the circuit court appointed Andrew R. Gelman as guardian *ad litem* to protect Mr. Greenspan's interests in connection with that petition. On October 21, the circuit court denied a motion by the guardian *ad litem* to strike and dismiss the petition on the grounds that the public guardian lacked standing, and the public guardian filed an amended petition to reflect the length of time that Mr. Greenspan had been in his current medical condition. On November 2, 1988, the circuit court denied the public guardian's amended petition. The public guardian appealed to the appellate court. We then ordered the appeal taken directly to us under Supreme Court Rule 302(b) (107 Ill. 2d R. 302(b)).

## I. FACTS

Mr. Greenspan, then a 76-year-old Chicago resident, suffered a stroke in November 1984, which resulted in the death of areas of his brain cells, left him unconscious, and is irreversible. In 1983, Mr. Greenspan had also been diagnosed as suffering from an organic brain syndrome, a senile dementia of the Alzheimer's type that was becoming increasingly acute. In December 1984, Mr. Greenspan became a nursing home resident. Mr. Greenspan has no dependent relatives or children, though his wife and adult children are living.

Mr. Greenspan has never executed a living will or a health care power of attorney. In fact, the Illinois Power

of Attorney Act (Ill. Rev. Stat. 1987, ch. 110½, par. 801—1 *et seq.*), which provides for such health care powers, did not become effective until 1987, although the Illinois Living Will Act (Ill. Rev. Stat. 1987, ch. 110½, par. 701 *et seq.*) became effective on January 1, 1984.

Medical testimony tends to prove that, for some five years now, Mr. Greenspan has been in a chronic vegetative state, meaning that he retains only the primitive cortical brain functions that regulate breathing and some other basic life processes separate from consciousness. There is no reasonable hope that he will recover from his condition. He lies in a fetal position, with severe muscular contracture, and with a nasogastric (artificial feeding) tube inserted through one of his nostrils.

At the hearing on the public guardian's petition, Dr. Allan Burke, a consulting physician, testified regarding Mr. Greenspan's medical condition and regarding medical ethics applicable to his case. In addition, a stipulation was received as to testimony of Mr. Greenspan's current attending physician, Dr. Charles Schikman, regarding Mr. Greenspan's condition. Dr. Steven H. Miles testified on medical ethics in cases such as Mr. Greenspan's. Mr. Greenspan's wife, two of his children, and a longtime employee of Mr. Greenspan testified regarding Mr. Greenspan's beliefs about being artificially maintained if one is completely incapacitated.

### A. Medical Testimony

*Dr. Burke.* The testimony of Dr. Allan Burke, who examined Mr. Greenspan and is a board-certified neurologist and assistant professor of clinical neurology at Northwestern University, was as follows.

Mr. Greenspan makes no eye contact with other persons and does not respond to stimuli, including painful stimuli. Electroencephalography confirms the lack of re-

sponse. Mr. Greenspan is incapable of any cognitive functioning or of feeling pain. If he were able to feel pain, he would feel marked pain because of the perpetual muscle contractures resulting from his brain injuries. Medical tests indicate that, as evidenced by shrinkage resulting from the death of brain cells during the years of Mr. Greenspan's artificial nutrition and hydration, the Alzheimer's-type disease is still progressively damaging Mr. Greenspan's brain, in addition to the damage originally wrought by his stroke. The medical literature contains no documented case history in which a patient recovered from a condition such as Mr. Greenspan's. Dr. Burke consulted Mr. Greenspan's medical records, his previous and current attending physicians, and a previous consulting physician; they all corroborated his findings.

If Mr. Greenspan had suffered his illness and stroke in earlier decades, he would soon have died from their effects. His death is prolonged now because of advances in artificial nutrition and hydration. Mr. Greenspan is terminally ill in the sense that his illness would have been terminal if current means of keeping him alive were unavailable. If Mr. Greenspan's artificial food and water were discontinued by removal of his feeding tube, he would die within a week at most. Such death would result from the combination of his terminal condition generally and one of its specific results, his inability to swallow. By contrast, 17 years is the record period for a patient's remaining in a chronically vegetative state with the aid of a feeding tube before dying. Analgesics could be given to relieve any pain associated with withdrawal of the feeding tube, but Mr. Greenspan shows no ability to feel any pain from any source.

It is consistent with sound medical practice and medical ethics to remove Mr. Greenspan's feeding tube, and its continued use "not only does nothing to reverse the injury of the brain, but actually allows the disease to

continue so that the dying out of brain cells is continuing."

(The guardian *ad litem* later stated to the trial court that he had attempted to find a physician who would testify in support of a position different from Dr. Burke's but that he had been unable to do so. The American Medical Association as *amicus* advises this court that, in circumstances resembling those alleged here, withdrawal of artificial nutrition and hydration is ethically sound. However, the American Academy of Medical Ethics and various physicians as *amici* advise us of their view that deciding to withdraw artificial nutrition and hydration is not a matter of peculiarly scientific or medical competence, that there is no clear medical consensus supporting such withdrawal, and that proffered justifications for such withdrawal rest on no principle that could be limited to patients who are in a persistent vegetative state rather than extending to those who suffer from related dementing processes.)

*Dr. Schikman.* The parties stipulated that Dr. Charles Schikman, a board-certified internist who was then Mr. Greenspan's treating physician and had been for the previous three years, would testify that he concurred with Dr. Burke's findings and recommendation for removing the feeding tube.

*Dr. Miles.* Dr. Steven H. Miles testified on medical ethics. He is a practicing geriatrician, a board-certified internist, an assistant professor of internal medicine, and the associate director of the Center for Clinical Medical Ethics at the University of Chicago. He stated that artificial nutrition and hydration are a form of elective medical treatment and that medical ethics would support feeding-tube withdrawal in a situation such as Mr. Greenspan's. Dr. Miles testified that the generally supported ethical view is that discontinuance of artificial food and water at a patient's direction would not amount

to suicide because it actually amounts to withdrawal of consent to therapy, and death ensues as a result of the underlying disease process.

Dr. Miles compared withdrawal of artificial food and water to withdrawal of chemotherapy when it is discovered that a cancerous tumor does not respond to the treatment. He also testified that medical ethics disfavors any policy absolutely requiring continued use of feeding tubes once they are put in place. He stated that such a policy might force patients and families to make a decision on the efficacy of the procedure prior to instituting it, despite the facts that some period of time is required in order to establish whether a coma is irreversible and that, until then, patients require medical support with food and fluids. He also testified that medical ethics literature treats a coma and a persistent vegetative state as equivalent conditions.

## B. Family, Employee, and Religious Testimony

Belle Greenspan, who has been Mr. Greenspan's wife for more than 50 years, and two of his four children testified. In addition, a 20-year employee of Mr. Greenspan, Helen Mueller, testified, and by stipulation a letter from Mr. Greenspan's former rabbi was admitted into evidence as testimony. These witnesses depicted Mr. Greenspan as a loving, active, concerned, religiously and civically involved man prior to his stroke, and they unanimously testified that he would not wish to be sustained as he now is.

*Mrs. Greenspan.* Belle Greenspan testified that Mr. Greenspan had told her many times that he would rather be shot than reside in a nursing home. Mrs. Greenspan stated that, though they had never talked about life-support systems, Mr. Greenspan would never have wished to live without full control of his faculties or as a burden to others and that, based on her relationship and conver-

sations with him, she believed that he would absolutely refuse artificial nutrition and hydration if faced with such a decision. She added that she would agree with him.

*Mrs. Richardson.* Marla Richardson, one of Mr. Greenspan's daughters, testified to the deterioration in her father's condition while he had been in the nursing home and to his previously expressed views on artificially sustained life. She also testified as follows.

He may have shown some response to her visits initially, but not thereafter. Physical therapy was attempted but was unsuccessful. He makes no body or eye movement when she tries to talk to him. Mrs. Richardson recalled once discussing with her father a newsworthy case involving life-support systems *(In re Quinlan* (1976), 70 N.J. 10, 355 A.2d 647) and recalled his statement that he would not wish to live under such conditions. She recalled that, when artificial life support was discontinued for a friend of hers who had been injured in a motoring accident, her father had said that life was not worth living without the capacity to enjoy it. She also recalled discussing with her father the case of a mutual friend who suffered from cancer and who had considered refusal of life-support systems; her father had agreed that when there is no chance to live, there is no reason to prolong dying. Based on her knowledge of her father, she felt that he would not wish to continue his artificial food and water without a chance of recovery, and she concurred that they should be discontinued.

*Ms. Rochelle.* Shelley Rochelle, another daughter of Mr. Greenspan, testified that she had never had a response from her father when she visited him in the nursing home. She also testified that, based on occasional prior conversations with him about death and on his repeatedly voiced abhorrence of nursing home life, she felt that "never in a million years" would he have accepted

his present mode of survival. She stated that, though she had never specifically discussed life-support systems with her father, he detested the idea of being incapacitated. The parties stipulated that the testimony of Mr. Greenspan's other two children present in court, Barbara Lando and Howard Greenspan, would be substantially the same as Ms. Rochelle's.

*Ms. Mueller.* Mr. Greenspan's employee, Helen Mueller, testified that, on the very day of his stroke, she had talked with Mr. Greenspan about the disability of the wife of one of his former employees, and she and Mr. Greenspan had told each other that they would never wish to be on a life-support system or in a nursing home. She added that Mr. Greenspan had said that he and his wife had discussed the subject and were in agreement. She also recalled that she and Mr. Greenspan had discussed nursing homes on other occasions, but she could recall no specific conversation.

*Rabbi Silverman.* By stipulation, the contents of a letter from Mr. Greenspan's former rabbi, Dr. Martin I. Silverman, of Albany, New York, were admitted into evidence as corresponding to what would be Rabbi Silverman's testimony. Rabbi Silverman stated that he had been the rabbi of Mr. Greenspan's congregation from 1964 to 1972 and that he had had many lengthy weekly conversations with Mr. Greenspan between 1964 and 1966, when Mr. Greenspan was president of the congregation. He added that Mr. and Mrs. Greenspan were active congregation members throughout his service there as rabbi. He stated that, on the basis of the conversations, he believed that Mr. Greenspan would not wish to exist in his current condition.

## C. Trial Court's Decision

During argument in the circuit court, the guardian *ad litem* reviewed the evidence and the factors that he felt

should guide the court, and he then recommended that the court grant the public guardian's petition.

Despite the guardian *ad litem*'s recommendation and the testimony just recounted, the trial judge denied the petition, stating:

"I do it on the basis that I believe that our legislature, in amending the Living Will Act in January of '88 in which it provided that nutrition and hydration shall not be withdrawn or withheld from a qualified patient if the withdraw[a]l or withholding would result in death solely from dehydration or starvation rather than from the existing terminal condition.

It provides in there that—there is no question we have an irreversible condition here, but there has been no testimony that death is imminent.

Death in this case would be imminent from the withdraw[a]l of the food and the hydration, so on the basis of what I believe the legislature has determined in January of this year, it would not even allow a mentally able person to provide for the withdraw[a]l of food and water *** ."

In this court, both the guardian *ad litem* and the public guardian support reversal of the circuit court's judgment. Accordingly, on our own motion, the Americans United for Life Legal Defense Fund (AUL) was appointed *amicus curiae* to advance the position that life-sustaining nutrition and hydration should not be withdrawn from Mr. Greenspan. Subsequently, we allowed motions by the American Medical Association and by the Society for the Right to Die, Inc., for leave to file briefs as *amici curiae* in support of reversal. We also allowed motions by the Ethics and Advocacy Task Force of the Nursing Home Action Group, by the American Academy of Medical Ethics and certain interested physicians, and by the Free Speech Advocates for leave to file briefs as *amici curiae* in support of affirmance. In addition, we allowed a motion by certain members of the Illinois Sen-

ate and House of Representatives for leave to appear as *amici curiae* and to join in the brief filed by AUL.

## II. ANALYSIS

### A. Standing

Initially, AUL contends that the public guardian lacks standing and is not the appropriate party to seek the relief he requests in his amended petition.

The public guardian replies that his amended petition for leave to order withdrawal of Mr. Greenspan's artificial nutrition and hydration was filed pursuant to section 11a—17 of the Probate Act of 1975 (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—17). That section provides in part:

"(a) *To the extent ordered by the court and under the direction of the court,* the guardian of the person shall have custody of the ward and his minor and adult dependent children; shall procure for them and shall make provision for their support, care, comfort, health, education and maintenance and such professional services as are appropriate ***." (Emphasis added.)

In addition, the public guardian states that the practice in the circuit court of Cook County is that the court be petitioned, whenever possible, for specific leave for a guardian to make medical decisions. He states that the chief judge of the circuit court has announced the position that, unless a plenary guardian of the person is acting under a power of attorney for health care (see Ill. Rev. Stat. 1987, ch. 110½, par. 804—1 *et seq.*) or in compliance with the Illinois Living Will Act (Ill. Rev. Stat. 1987, ch. 110½, par. 701 *et seq.*), the guardian lacks authority to consent to removal of life-support equipment except to the extent ordered by the court and under the court's direction. Accordingly, the public guardian contends that his standing and authority to file his petition are clear.

To support its contention that the public guardian lacks standing, AUL relies on *In re Marriage of Drews* (1986), 115 Ill. 2d 201. *Drews* involved a petition, by the plenary guardian of a ward's estate and person, for dissolution of the ward's marriage to a wife who had abandoned him. However, as we found in *In re Estate of Longeway* (1989), 133 Ill. 2d 33, 45-46, the *Drews* case is inapposite, because here the guardian is not instituting a legal proceeding on behalf of Mr. Greenspan but is merely himself petitioning the court for specific authorization to perform an act that is within his own implied powers under the Probate Act.

Without citing authority, AUL contends that, even if a guardian has standing to maintain an action such as the present one, the public guardian is an inappropriate party to do so. AUL states that it is unconscionable for the public guardian, as an official who serves in his county at the pleasure of the chief judge of the circuit court (Ill. Rev. Stat. 1987, ch. 110½, par. 13—1.1), to use his government position to "starve incompetent wards to death." AUL also asserts that the public guardian should not be appointed guardian to seek discontinuance of artificial food and water for persons who are neither indigent nor without close family members.

Under section 13—5 of the Probate Act of 1975 (Ill. Rev. Stat. 1987, ch. 110½, par. 13—5), the public guardian may be appointed as guardian of any disabled adult who is in need of a public guardian and whose estate's value exceeds the amount (currently $25,000) set in section 25—1 of the Act (Ill. Rev. Stat. 1987, ch. 110½, par. 25—1) for administration of small estates. We assume from the record and from the lack of any contrary allegations that Mr. Greenspan's estate exceeds $25,000 in value. In addition, when the circuit court appointed the public guardian as guardian of Mr. Greenspan's person, it did so on the basis of a verified petition that had been

served on Mr. Greenspan and his family members individually. The circuit court found that, because of his stroke, Mr. Greenspan was totally without capacity to make or communicate decisions regarding his person. It was within the circuit court's discretion to conclude that, in these circumstances, Mr. Greenspan was in need of a public guardian. Thus, the public guardian's appointment complied with the Act.

When so appointed, the public guardian has the same powers and duties as other guardians appointed under the Act, with certain exceptions not relevant here. (See Ill. Rev. Stat. 1987, ch. 110½, par. 13—5.) Therefore, if, as we have already concluded, a guardian generally has standing to file a petition such as the present one, so does the public guardian.

### B. Best Interests and Substituted Judgment

Apart from the question of standing, AUL contends that the relief sought by the public guardian conflicts with his statutory duties to provide for Mr. Greenspan's "support, care, comfort, health, education and maintenance" and appropriate professional services. (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—17(a); see *In re Estate of Burgeson* (1988), 125 Ill. 2d 477, 486.) AUL says that the public guardian must act in Mr. Greenspan's best interests (see *In re Estate of Robertson* (1986), 144 Ill. App. 3d 701, 712; *In re Estate of D.W.* (1985), 134 Ill. App. 3d 788, 791) and that discontinuance of Mr. Greenspan's artificial nutrition and hydration would result in his death, would not be in his best interest, and would not be consistent with his support, care, comfort, health, or maintenance. Analogizing to the holding in *Cruzan v. Harmon* (Mo. 1988), 760 S.W.2d 408, 424, 426, *aff'd* (1990), 497 U.S. ___, 111 L. Ed. 2d 224, 110 S. Ct. 2841, that coguardians lacked statutory authority to order termination of medical treatment, AUL asks us to

hold that a guardian lacks statutory authority to order withdrawal of "life-sustaining food and water" from an incompetent ward. That, of course, is not precisely the issue here. Instead of ordering withdrawal of artificial nutrition and hydration on the basis of any asserted statutory authority of his own, the public guardian has sought leave of court to order such withdrawal as Mr. Greenspan's surrogate and in order to give effect to what are represented as Mr. Greenspan's own wishes; and the question as initially framed by AUL is whether taking such a measure would conflict with the public guardian's statutory duties as Mr. Greenspan's guardian.

After the parties' briefs were filed, we had occasion in another cause to address several of the legal issues involved here. (See *In re Estate of Longeway* (1989), 133 Ill. 2d 33.) Artificial nutrition and hydration through a feeding tube are considered death-delaying procedures by the Illinois Living Will Act (Ill. Rev. Stat. 1987, ch. 110½, par. 702(d); *Longeway*, 133 Ill. 2d at 41), even though the Act forbids withdrawal of nutrition and hydration pursuant to a living will if death would result "solely" from such withdrawal "rather than from an existing terminal condition." Artificial nutrition and hydration are also considered health and medical care by the Powers of Attorney for Health Care Law (Ill. Rev. Stat. 1987, ch. 110½, pars. 804—10(a), (b)(1); *Longeway*, 133 Ill. 2d at 41) and may be withdrawn pursuant to that Law (*Longeway*, 133 Ill. 2d at 46). Neither the Act nor the Law applies directly to a person such as Mr. Greenspan who has executed neither a living will nor a health care power of attorney. However, those statutes' classification of artificial nutrition and hydration as death-delaying medical procedures, rather than merely alternative methods of nourishment, is instructive. (See *Longeway*, 133 Ill. 2d at 41-42.) When, as the result of incurable illness, a patient cannot chew or swallow and a

death-delaying feeding tube is withdrawn in scrupulous accordance with law, the ultimate agent of death is the illness and not the withdrawal. *Longeway,* 133 Ill. 2d at 42.

We decided in *Longeway* that a patient's right to refuse medical treatment, including artificial nutrition and hydration, is supported by the common law (133 Ill. 2d at 44-45) and that under section 11a—17 of the Probate Act of 1975 (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—17), in the case of an incompetent patient, the right may be exercised by a guardian as surrogate (133 Ill. 2d at 45-46). However, we also decided in *Longeway* (133 Ill. 2d at 47-53) that, pending any constitutionally permissible modification of the common law by the legislature, a surrogate can exercise the right for an incompetent patient only if:

(1) the incompetent is terminally ill as defined in section 2(h) of the Illinois Living Will Act (Ill. Rev. Stat. 1987, ch. 110½, par. 702(h)), *i.e.,* the patient's condition is incurable and irreversible so that death is imminent and the application of death-delaying procedures serves only to prolong the dying process;

(2) the incompetent has been diagnosed as irreversibly comatose or in a persistently vegetative state;

(3) the incompetent's attending physician and at least two other consulting physicians have concurred in the diagnosis;

(4) the incompetent's right outweighs any interests of the State, as it normally does;

(5) it is ascertained, by an appropriate means— *e.g.,* by the procedure of substituted judgment on the basis of clear and convincing evidence as outlined in *Longeway*—what the incompetent presumably would have decided, if competent, in the circumstances; and

(6) a court enters an order allowing the surrogate to exercise the incompetent's right to refuse the treatment.

In view of the foregoing, AUL's argument that the authorized withdrawal of artificial nutrition and hydration would itself cause Mr. Greenspan's death is erroneous. (*Cf.* Hodgman & Frazer, *Withholding Life Support Treatment in Illinois*, 73 Ill. B.J. 106, 108 (1984) (mere withdrawal is not suicide).) AUL's associated argument that withdrawal would not be in Mr. Greenspan's best interest is more problematic but fails as well.

Though a guardian's duty is to act in a ward's best interest, such a standard is necessarily general and must be adapted to particular circumstances. One such circumstance is a ward's wish to exercise common law, statutory, or constitutional rights, which may sometimes influence or even override a guardian's own perception of best interests. (See, *e.g.*, *In re Estate of Brooks* (1965), 32 Ill. 2d 361 (conservator could not compel arguably incompetent ward to accept blood transfusion she had steadfastly refused on first amendment grounds while competent); *In re Gardner* (1984), 121 Ill. App. 3d 7 (given statutory due process rights of involuntary commitment respondents, court had no power to order guardian to apply, and guardian had no power to apply, for admission of nonconsenting ward to mental health facility as voluntary patient).) This tension between a ward's legal rights of volition and a guardian's own judgment of the ward's best interests resembles the tension this court discerned in *Longeway* (133 Ill. 2d at 48-49) between the best-interests and substituted-judgment theories for deciding whether to discontinue an incompetent and terminally ill patient's artificial life support.

In *Longeway*, this court approved application of the substituted-judgment theory, which requires a surrogate decisionmaker to establish, as accurately as possible, what the patient would decide if competent. (*Longeway*, 133 Ill. 2d at 49.) Ascertainment of what the patient

would decide must be based on clear and convincing evidence of the patient's intent, derived either from a patient's explicit expressions of intent or from knowledge of the patient's personal value system. *Longeway*, 133 Ill. 2d at 49-51, citing *In re Jobes* (1987), 108 N.J. 394, 415, 529 A.2d 434, 445.

If it is clearly and convincingly shown that Mr. Greenspan's wishes would be to withdraw artificial nutrition and hydration, and if the other established criteria for permitting such withdrawal are met, Mr. Greenspan's imputed choice cannot be governed by a determination of best interests by the public guardian, AUL, or anyone else. Otherwise, the substituted-judgment procedure would be vitiated by a best-interests guardianship standard, elevating other parties' assessments of the meaning and value of life—or, at least, their assessments of what a reasonable individual would choose—over the affected individual's own common law right to refuse medical treatment. Accordingly, the public guardian is not prevented by a best-interests standard from seeking relief in accordance with Mr. Greenspan's wishes as determined by substituted-judgment procedure. See *Longeway*, 133 Ill. 2d at 45-46 (a guardian has power, in accordance with prescribed guidelines, to exercise disabled ward's right to refuse artificial sustenance); *cf. Newman v. Newman* (1963), 42 Ill. App. 2d 203, 213 (certain rights are so personal that conservator can neither exercise them for incompetent nor change an act performed under such right by incompetent prior to disability, though courts can permit conservator to exercise particular rights of incompetent where shown to be beneficial to ward's maintenance and welfare); *Lewis v. Hill* (1943), 317 Ill. App. 531, 534-35, *appeal after remand* (1944), 322 Ill. App. 68, *aff'd* (1944), 387 Ill. 542 (except as required to support testator, conservator of an insane

person could not revoke provisions of will made when person had testamentary capacity).

## C. Effect of Living Will Act

Contrary to the views of AUL and of the circuit court, the Illinois Living Will Act (Ill. Rev. Stat. 1987, ch. 110½, par. 701 *et seq.*) does not bar the relief sought by the public guardian.

First, as noted in *Longeway* (133 Ill. 2d at 53-54), the Act does not apply directly to the situation of one such as Mr. Greenspan, because he has not executed a living will—even though the Act, like other statutes, may be relevant in ascertaining public policy and even though in *Longeway* (133 Ill. 2d at 47) this court looked to the Act's definition of a terminal condition.

Second, a subsequent statute—the Powers of Attorney for Health Care Law (Ill. Rev. Stat. 1987, ch. 110½, par. 804—1 *et seq.*), enacted more than three years after the Illinois Living Will Act became effective—enunciated a public policy that withdrawal or withholding of food and water or fluids is within the powers conferrable through a health care agency (see Ill. Rev. Stat. 1987, ch. 110½, pars. 804—10(a), (b)(1)); that the subsequent statute prevails over all inconsistent acts (see Ill. Rev. Stat. 1987, ch. 110½, par. 804—11); and that if the principal under a health care power also has a living will, the living will shall not be operative so long as the agent under the power is available to act (see Ill. Rev. Stat. 1987, ch. 110½, par. 804—11). See *Longeway*, 133 Ill. 2d at 54.

As AUL points out, it is true that, with a more recent effective date than that of the Powers of Attorney for Health Care Law, the legislature has expressed itself by amending the Illinois Living Will Act to provide, in the present section 2(d) thereof, that a "qualified patient" shall not be deprived of artificial nutrition and hy-

dration if the deprivation alone would be the cause of death. See Pub. Act 85—860, §1, eff. Jan. 1, 1988 (amending Ill. Rev. Stat. 1985, ch. 110½, par. 702(c), now Ill. Rev. Stat. 1987, ch. 110½, par. 702(d)).

However, a "qualified patient" merely means one who is terminally ill and has executed a living will. (Ill. Rev. Stat. 1987, ch. 110½, par. 702(g).) The principal in a health care power of attorney will not necessarily have executed a living will, and, even if such a will has been executed, its operation is suspended so long as the health care agent is available to act. (See Ill. Rev. Stat. 1987, ch. 110½, par. 804—11; *Longeway*, 133 Ill. 2d at 54.) Accordingly, there is no conflict between the Powers of Attorney for Health Care Law and the amended Illinois Living Will Act that could be held to result in implied amendment of the Law. (Moreover, section 9(d) of the Act (Ill. Rev. Stat. 1987, ch. 110½, par. 709(d)) provides that the Act shall not impair or supersede any person's legal right or responsibility to withhold or withdraw death-delaying procedures in any lawful manner and that, in such respect, the Act's provisions are cumulative. Though AUL argues to the contrary, the latter provision possibly adds support to our decision in the present cause; but we need not rely on it here.)

Since there is no conflict between the Illinois Living Will Act and the Powers of Attorney for Health Care Law by virtue of the Act's amendment, AUL can extract no public policy from section 2(d) of the Act that outweighs the public policy expressed in the Law. Both statutes are relevant guides to public policy (as in *Longeway*, 133 Ill. 2d at 53-54) when we consider the case of Mr. Greenspan, who has executed neither a living will nor a health care power.

As in *Longeway* (133 Ill. 2d at 55), we find no statute or legislative expression of public policy that prohibits court authorization for the public guardian to order with-

drawal of Mr. Greenspan's artificial nutrition and hydration. Accordingly, the circuit court erred to the extent that its denial of the public guardian's amended petition relied on the Illinois Living Will Act.

## D. Imminence of Death

AUL contends, and the circuit court found, that there was no testimony that Mr. Greenspan's death would be imminent in the absence of the feeding tube. Before withdrawing the feeding tube, imminence of death would be required if the Illinois Living Will Act applied directly here; though the Act does not apply directly, its requirement of imminence was effectively adopted by *Longeway* (133 Ill. 2d at 47) as one of the criteria for authorizing withdrawal.

As we have seen, Dr. Burke did testify that, without the tube, Mr. Greenspan would die in no more than a week. Though AUL argues that Dr. Burke acknowledged that, with feeding tubes, patients have been known to live for years in a chronic vegetative state, such a fact is irrelevant. Under section 2(h) of the Illinois Living Will Act, from which *Longeway* (133 Ill. 2d at 47) borrowed the definition of terminal illness, a terminal condition is one in which (1) death is imminent *and* (2) death-delaying procedures serve only to prolong the dying process. (Ill. Rev. Stat. 1987, ch. 110½, par. 702(h).) Death-delaying procedures can include tube-feeding. (Ill. Rev. Stat. 1987, ch. 110½, par. 702(d).) If the very delay caused by the procedures were allowed to govern the assessment of imminence, the Act's definition of a terminal condition would be rendered circular and meaningless.

Imminence must be judged as if the death-delaying procedures were absent, and in this case the testimony was that Mr. Greenspan's death would occur within a week after withdrawal of the feeding tube. "Imminent" has been defined as "[n]ear at hand; mediate rather than

immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous." (Black's Law Dictionary 676 (5th ed. 1979).) None of the parties disputes that death is imminent when expected within a week.

Accordingly, the circuit court erred in finding an absence of testimony that Mr. Greenspan's death was imminent. The court also erred in denying the public guardian's amended petition to the extent that the denial relied on that ground.

## E. Effect of Nursing Home Act

AUL contends that various provisions of the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—101 *et seq.*) require that the nursing home where Mr. Greenspan resides continue to give him food and water and that the Act thus forbids the relief sought by the public guardian. AUL points to a provision contemplating that nursing homes will furnish residents with "personal care, sheltered care or nursing" (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—113), "sheltered care" being defined as "maintenance and personal care" (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—124), "maintenance" being defined as "food, shelter and laundry services" (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—116), and "personal care" being defined as including assistance with "meals *** whether or not a guardian has been appointed" (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—120). In addition, AUL cites a provision that "neglect" is "a failure in a facility to provide adequate medical or personal care or maintenance, which failure results in physical or mental injury to a resident or in the deterioration of a resident's physical or mental condition." (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—117.) While admitting that a resident has the right to refuse medical treatment (see Ill. Rev. Stat. 1987, ch. 111½,

par. 4152—104(b)), AUL asserts that the right does not extend to the resident's guardian. Compare Ill. Rev. Stat. 1987, ch. 111½, par. 4152—104(b), with Ill. Rev. Stat. 1987, ch. 111½, par. 4152—104(c).

We find these contentions by AUL to be immaterial. The public guardian does not request that Mr. Greenspan's artificial nutrition and hydration be discontinued either by or at the nursing home where he resides. The Act specifically grants a resident's guardian the right to procure the resident's discharge. (Ill. Rev. Stat. 1987, ch. 111½, par. 4152—111.) In any event, even before discharge, the Act contains no provision forbidding a nursing home from acting in accordance with a court order. A patient has the right to obtain or refuse medical treatment (Ill. Rev. Stat. 1987, ch. 111½, par. 4152—104), and not even the Department of Public Health is permitted to prescribe the course of treatment by a resident's personal physician (Ill. Rev. Stat. 1987, ch. 111½, par. 4153—201). We do not believe that generalized references to providing food, water, and meals should override either a resident's specific right to refuse medical treatment, the definition of health or medical care found elsewhere in our law (e.g., Ill. Rev. Stat. 1987, ch. 110½, pars. 804—10(a), (b)(1); Longeway, 133 Ill. 2d at 41), or, for that matter (in any case to which they were pertinent), a resident's religious rights (Ill. Rev. Stat. 1987, ch. 111½, par. 4152—109). In fact, the Act imposes liability on a nursing home for acts or omissions that injure residents (Ill. Rev. Stat. 1987, ch. 111½, par. 4153—601), and Dr. Burke testified that continued artificial nutrition and hydration facilitate additional devastation by an Alzheimer's type of brain syndrome from which Mr. Greenspan suffers. Whether or not maintaining the feeding tube would actually result in such liability for the nursing home, the Act clearly does not forbid awarding the public guardian the relief sought.

### III. CONCLUSION

During the period of time that has elapsed since this appeal was filed, Mr. Greenspan's condition conceivably could have improved, remained the same, or worsened. Moreover, *Longeway* was decided in the meantime and bears on the evidentiary submissions and standard of proof necessary in the circuit court. We note that one of the evidentiary requirements articulated in *Longeway* is that, in the case of an incompetent and terminally ill patient, at least two consulting physicians concur in the attending physician's diagnosis of an irreversible comatose or persistently vegetative state. (*Longeway*, 133 Ill. 2d at 47-48.) In the present cause, the parties stipulated that Mr. Greenspan's current attending physician would testify that Mr. Greenspan is in a persistent vegetative state, is not aware of or responsive to his surroundings, and "will not recover capacity for significant functioning with any type of treatment." Only one consulting physician testified to his diagnosis; he added that Mr. Greenspan's former attending physician concurred with his recommendation for feeding-tube withdrawal. Hearsay evidence was admitted as to other statements made by a second consultant and by Mr. Greenspan's former attending physician and as to the records of a third consultant. It is not altogether clear whether and how much of this evidence comprised the required diagnosis and concurrences. Finally, clear and convincing evidence is required in order to establish Mr. Greenspan's intent regarding withdrawal of the feeding tube.

Accordingly, the judgment of the circuit court of Cook County is vacated, and this cause is remanded to that court for further proceedings consistent with this opinion.

*Judgment vacated;*
*cause remanded.*

JUSTICE CLARK took no part in the consideration or decision of this case.

JUSTICE WARD, dissenting:

I respectfully dissent.

In *In re Estate of Longeway* (1989), 133 Ill. 2d 33, this court announced narrow guidelines and procedures under which life-sustaining medical treatment, including artificially supplied nutrition and hydration, may be withdrawn from an incompetent patient. I dissented and continue to believe that the court was wrong when it held that third persons, under the fiction of substituted judgment, may withhold food and water from an incompetent patient who can neither reject nor accept the decision that his or her life will intentionally be taken. In my opinion, *Longeway* ignores the simple but surpassingly important distinction between the right to choose the surrender of one's own life and the right to direct the death of another. *Longeway* is, or should be, controlling precedent and I dissent here only from those parts of the majority opinion which, I consider, depart from the guidelines adopted in *Longeway*.

The *Longeway* opinion held that a guardian may refuse artificially supplied nutrition and hydration on behalf of an incompetent ward only if: (1) the incompetent patient is terminally ill as defined in the Living Will Act; (2) the incompetent has been diagnosed as irreversibly comatose or in a persistently vegetative state; (3) the incompetent's attending physician and at least two other consulting physicians concur in the diagnosis; (4) the incompetent's right to refuse treatment outweighs the State's countervailing interests; (5) there is clear and convincing evidence that the incompetent patient, if competent, would approve the withdrawal in the circumstances; and (6) a court determines that the above re-

quirements are satisfied and authorizes the surrogate to refuse treatment on behalf of the incompetent patient. *Longeway*, 133 Ill. 2d at 47-53.

The majority opinion does not follow this standard in several significant respects. First, and of crucial importance, the majority effectively eliminates the requirement that the incompetent patient must be terminally ill within the meaning of the Living Will Act (Ill. Rev. Stat. 1987, ch. 110½, par. 702(h)) before nutrition and hydration can be withdrawn. A terminal condition referred to in *Longeway* is defined in section 2(h) of the Living Will Act as:

> "an incurable and irreversible condition which is such that death is imminent and the application of death delaying procedures serves only to prolong the dying process." (Ill. Rev. Stat. 1987, ch. 110½, par. 702(h).)

The majority acknowledges that the evidence at the hearing in the circuit court established that Mr. Greenspan's death will not be imminent unless the feeding tubes are removed. To overcome these evidentiary deficiencies, the majority states that imminence must be judged as if the life-sustaining procedures were not in place. It then states that the testimony that Mr. Greenspan's death would occur within a week after withdrawal of the feeding tube is sufficient to satisfy the requirement of imminence of death. One submits that death for almost anyone would result or would be imminent if nourishment were withdrawn for a week.

In so holding, the majority does not conform to the definition of a terminal condition stated in the Living Will Act, and instead adopts the somewhat extraordinary testimony of Dr. Burke that "Mr. Greenspan is terminally ill in the sense that his illness would have been terminal if current means of keeping him alive were unavailable." (See 137 Ill. 2d at 6.) This view of what is a terminal illness is obviously unacceptable. Many illnesses would be terminal were it not for the resources of mod-

ern medicine. If Dr. Burke's purported definition of terminal illness were to be followed, many patients with treatable illnesses might be regarded as facing imminent death and being terminally ill (*e.g.*, pneumonia patients might face imminent death without antibiotics; those with many other illnesses would progress to a state of imminent death without modern treatment).

The definition of "terminal condition" stated in the Living Will Act requires that the patient's death be imminent as a result of the incurable and irreversible condition *whether or not* death-delaying procedures are applied. Life-sustaining measures, such as the provision of food and water, may be withdrawn only if the patient will die regardless of whether or not the measures are administered. The Living Will Act's carefully narrow definition of "terminal condition" permits the withdrawal of life-sustaining measures, such as food and water, only when those measures would be futile. Mr. Greenspan is not terminally ill within the meaning of the Living Will Act because he is not suffering from an incurable and irreversible condition "which is such that death is imminent." Ill. Rev. Stat. 1987, ch. 110½, par. 702(h).

As I noted in my dissenting opinion in *Longeway*, it is said that 19.4% of patients in intermediate care nursing facilities and 33.8% of patients in this State's skilled nursing homes receive tube-feeding or need assistance to obtain sustenance. (*Longeway*, 133 Ill. 2d at 56.) It would appear that under the majority's seeming standard, patients dependent upon artificial nutrition and hydration would qualify as "terminally ill" within the meaning of the Living Will Act if they have an incurable and irreversible condition. Those patients qualify as "terminally ill" even if their conditions are not life-threatening. There are conditions which are incurable and irreversible, but do not necessarily produce a condition of imminent death. Exemplary of this are cerebral palsy, many forms of can-

cer, emphysema, diabetes, cystic fibrosis and multiple sclerosis. Many forms of mental illness likewise are incurable and irreversible.

Even if the majority did not hold that Mr. Greenspan is "terminally ill" within the meaning of the Living Will Act, it errs in holding that his death will be caused by his underlying terminal condition, rather than from the withdrawal of artificial nutrition and hydration. (137 Ill. 2d at 17.) The majority states, "[W]hen, as the result of incurable illness, a patient cannot chew or swallow and a death-delaying feeding tube is withdrawn in scrupulous accordance with law, the ultimate agent of death is the illness and not the withdrawal." 137 Ill. 2d at 15-16, citing *Longeway*, 133 Ill. 2d at 42.

The assumption of the majority that Mr. Greenspan is unable to swallow as a result of his condition is gratuitous. The record shows that, although Mr. Greenspan suffered a stroke in November 1984, the nasogastric feeding tube was not inserted until the spring of 1985. Mr. Greenspan's daughter testified that Mr. Greenspan ate pureed food for several months after he was admitted to the nursing home. Too, Dr. Burke testified that patients, like Mr. Greenspan, who are in a chronic vegetative state retain brain-stem reflexes, including the ability to swallow. The record suggests that Mr. Greenspan retains his ability to swallow food, and that the nasogastric tube was inserted only to make feeding him more convenient and to eliminate any risks associated with feeding him pureed food.

In view of the evidence that Mr. Greenspan retains the ability to swallow, the majority's conclusion that he will die as a result of his supposed "inability to swallow" or "terminal illness" cannot stand. Mr. Greenspan will not die of senile dementia or the stroke. If the nasogastric tube is removed and he is not otherwise supplied with nutrition and hydration, Mr. Greenspan will die of starvation

and dehydration as a direct result of the decision not to feed him.

The majority does remand the cause because, *inter alia*, "clear and convincing evidence is required in order to establish Mr. Greenspan's intent regarding withdrawal of the feeding tube." (137 Ill. 2d at 24.) This is important because the record shows that the evidentiary hearing which was held was not adversarial in nature. The guardian *ad litem* who was appointed to represent Mr. Greenspan's interests did not present any witnesses at the hearing and even recommended that the court grant the public guardian's petition to remove Mr. Greenspan's nutrition and hydration.

In *Longeway*, this court held that the evidence must *clearly and convincingly* demonstrate that an incompetent patient, if competent, would refuse nutrition and hydration under the circumstances. (*Longeway*, 133 Ill. 2d at 47-51; see also *Cruzan v. Harmon* (Mo. 1988), 760 S.W.2d 408, *aff'd* (1990), 497 U.S. ___, 111 L. Ed. 2d 224, 110 S. Ct. 2841.) This standard is necessarily subjective. The question is not what the guardian would choose, or what a reasonable or average person would choose to do under the circumstances. Rather, the issue is whether the particular patient, if competent, would choose to terminate the treatment sustaining his life under the circumstances. (*In re Conroy* (1985), 98 N.J. 321, 360, 486 A.2d 1209, 1229.) Evidence tending to establish the patient's intent is to be considered by both the surrogate decisionmaker and the court responsible for overseeing the surrogate's decision.

The surrogate decisionmaker may not presume that general statements, such as an expression by the patient that he would not want to be "artificially sustained" by "heroic measures" in a "hopeless" condition, indicate that the patient would choose to forgo all life-sustaining treatment if physically incapacitated in any manner. (*In re*

*Conroy* (1985), 98 N.J. 321, 364 n.7, 486 A.2d 1209, 1231 n.7.) As the New York Court of Appeals recognized in *In re O'Connor* (1988), 72 N.Y.2d 517, 532, 531 N.E.2d 607, 614:

> "If such statements were routinely held to be clear and convincing proof of a general intent to decline all medical treatment once incompetency sets in, few nursing home patients would ever receive life-sustaining medical treatment in the future. The aged and infirm would be placed at grave risk if the law uniformly but unrealistically treated the expression of such sentiments as a calm and deliberate resolve to decline all life-sustaining medical assistance once the speaker is silenced by mental disability."

The American Medical Association's *amicus curiae* brief simply argues that providing Mr. Greenspan with nutrition and hydration is not beneficial because it does not advance his interest in recovery. But of course, food and water are not consumed to treat or cure disease. Instead, they provide ordinary sustenance and comfort. It appears to be the argument of the *amicus* that patients, like Sidney Greenspan, who are in a persistent vegetative state must be able to derive greater benefit from food and water—such as assistance in recovering from the underlying disability—than those who are not in that condition. I do not believe that the nourishing of Mr. Greenspan should be discontinued because he is impaired and cannot recover. To do that would mean that his life in its present form is not worth living. (*Cruzan v. Harmon* (Mo. 1988), 760 S.W.2d 408.) A diminished quality of life will not support an unconditional decision to terminate life-sustaining procedures. This court has rejected the proposition that life itself can be useless or an excessive burden. *Siemieniec v. Lutheran General Hospital* (1987), 117 Ill. 2d 230.

JUSTICE CALVO joins in this dissent.