SIXTH DIVISION
 December 13, 1996 




















No. 1-96-0238
DARLENE FICKE, Special ) Appeal from the
Administrator of the Estate of ) Circuit Court of
DOROTHY FICKE, Deceased, and ) Cook County.
DARLENE FICKE, THOMAS FICKE, and )
MICHAEL FICKE, )
 )
 Plaintiffs-Appellants, )
 )
 v. )
 )
EVANGELICAL HEALTH SYSTEMS, )
d/b/a Christ Hospital, and ) 
JOSE ARUGUETE, M.D. ) Honorable
 ) Patrick E. McMann,
 Defendants-Appellees. ) Judge Presiding.

 JUSTICE GREIMAN delivered the opinion of the court:
 This case presents the questions of whether, to what extent
and to whom a hospital and physician may be liable for alleged
violations of the Illinois Health Care Surrogate Act (the Act) 
(755 ILCS 40/1 et seq. (West 1992)). The Act authorizes a
surrogate to decide, subject to certain conditions, whether to
discontinue life-sustaining medical treatment when the patient is
found to lack decisional capacity.
 On December 9, 1993, plaintiffs, Darlene, Thomas and Michael
Ficke, filed a four-count complaint against Evangelical Health
Systems (the Hospital) and Dr. Jose Aruguete (Aruguete), seeking
damages for injuries sustained by plaintiffs' decedent, Dorothy
Ficke (Ficke). Plaintiffs maintained, in count I of their second
amended complaint, that the Hospital was liable to decedent's
estate for its failure to comply with certain provisions of the
Act. Count III claims that the Hospital is similarly liable to
Ms. Ficke's children for such violations. Count IV seeks damages
pursuant to the Act for physical and mental injuries incurred by
plaintiffs as a result of Aruguete's negligent treatment of Ficke
and misapprehension of the Act. Count II of the amended
complaint, brought by the estate against Aruguete, was dismissed
with leave to refile and is not before this court on appeal. 
 In a memorandum opinion and order entered on December 21,
1995, the trial court dismissed with prejudice counts I, III and
IV of plaintiffs' second amended complaint. On January 11, 1996,
plaintiffs timely filed their notice of appeal from the trial
court's order of dismissal. For the reasons that follow, we
affirm.
 The following facts are adduced from plaintiffs' second
amended complaint. Ficke was admitted to the Hospital, under the
care of Dr. Aruguete, on March 8, 1993, with the diagnosis of a
CVA (stroke). Ficke was 81 years old with a recent history of
diabetes, arthritis, gout, hypertension, congestive heart
failure, respiratory disease and depression. A "do not
recessitate" (DNR) order was entered in Ficke's chart on March
17, 1993.
 Plaintiffs' complaint alleges that on or shortly after her
admission to the Hospital, Ficke lacked decisional capacity and
suffered from a "qualifying condition" as to the operation of the
Act because she lacked the ability to communicate meaningful
thought, was unable to socially interact and lacked awareness of
self and her environment. During Ficke's stay at the Hospital,
Aruguete continued to prescribe treatment, including surgery,
which the Hospital provided. These acts of rendering life-
sustaining or life-prolonging intervention were contrary to the
plaintiffs' expressed wishes. Moreover, the failure of the
Hospital and Aruguete to inform plaintiffs of their rights under
the Act, in addition to their own, independent, noncompliance
with the Act's terms, violated the Act and caused plaintiffs'
injuries. 
 As a general principle of Illinois law, competent adults
have the right to refuse any type of medical care, including
life-sustaining treatment. The right to refuse medical care has
been recognized under constitutional right-to-privacy principles
and is deeply ingrained in common law principles of individual
autonomy, self-determination, and informed consent. See generally
Fatum, Kane, & LeBlang, A Review of the Illinois Health Care
Surrogate Act, 80 Ill. Bar. J. 124 (1992); see also Union Pacific
Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S. Ct. 1000, 1001, 35
L. Ed. 734, 737 (1891) ("No right is held more sacred, or is more
carefully guarded, by the common law, than the right of every
individual to the possession and control of his own person, free
from all restraint or interference of others, unless by clear and
unquestionable authority of law").
 Although the right is recognized, implementation of that
right, traditionally through judicial intervention, has been
cumbersome and often untimely, in many instances resulting in the
very manner of death sought to be avoided by patients prior to
legal vindication of their right to forgo treatment. See, e.g.,
In re Conroy, 98 N.J. 321, 342, 486 A.2d 1209, 1217 (1985);
Bartling v. Superior Court, 163 Cal. App. 3d 186, 190, 209 Cal.
Rptr. 220, 221 (1984); John F. Kennedy Memorial Hospital v.
Bludworth, 452 So.2d 921, 923 (Fla. 1984); Satz v. Perlmutter,
379 So.2d 359 (Fla. 1980); Corbett v. D'Alessandro, 487 So.2d
368, 369 (Fla. App. 1986); In re L.H.R., 253 Ga. 439, 321 S.E.2d
716 (1984); In re Spring, 380 Mass. 629, 631, 405 N.E.2d 115,
117-118 (1980); In re Storar, 52 N.Y.2d 363, 369, 420 N.E.2d 64,
66, 438 N.Y.S.2d 266, 268 (1984); In re Hamlin, 102 Wash.2d 810
(1984).
 In Illinois, legislative response in this area first took
the form of the Illinois Living Will Act (Will Act) (755 ILCS
35/1 et seq. (West 1992)). The Will Act recognized that
individuals "have the fundamental right to control the decisions
relating to the rendering of their own medical care, including
the decision to have death delaying procedures withheld or
withdrawn in instances of a terminal condition." 755 ILCS 35/1
(West 1992). Under the Will Act, individuals can document their
wishes concerning life-sustaining treatment before they develop a
terminal condition and lack the capacity to make such a decision.
755 ILCS 35/3 (West 1992). However, living wills soon proved too
inflexible to adequately address the needs of individuals wishing
to make advance health care decisions. They were applicable only
in cases of terminal illness, which requires that death be
imminent. Moreover, they would not permit health care providers
to withhold or withdraw artificial nutrition or hydration when
such action would be the sole cause of death. See 80 Ill. Bar. J.
at 125.
 Subsequently, the Illinois legislature passed article IV of
the Powers of Attorney for Health Care Law (Powers of Attorney
Law) (755 ILCS 45/4-1 (West 1992)), which permits an individual
to delegate, "without limitation, all powers an individual may
have to be informed about and to consent to or refuse or withdraw
any type of health care for the individual and all powers a
parent may have to control or consent to health care for a minor
child." 755 ILCS 45/4-3 (West 1992). Thus, absent the limitations
present in the Will Act, the Powers of Attorney Law provides a
more comprehensive and effective means of delegating health-care
decisions. Yet, under either statutory scheme, no provision is
made for individuals who lack decision-making capacity and who
have not executed a living will or a power of attorney for health
care.
 Two supreme court decisions addressed this "gap" and found a
right to refuse life-sustaining treatment in our state's common
law and in the provisions of the Probate Act of 1975 (755 ILCS 5
et seq., (West 1992)). In re Estate of Longeway, 133 Ill. 2d 33
(1989); In re Estate of Greenspan, 137 Ill. 2d 1 (1990). The
court held that a surrogate can exercise the right for an
individual lacking decisional capacity only if: (1) the
individual is terminally ill as defined in section 2(h) of the
Will Act; (2) the individual has been diagnosed as irreversibly
comatose or in a persistently vegetative state; (3) the
individual's attending physician and at least two other
consulting physicians have concurred in the diagnosis; (4) the
individual's right outweighs any interests of the State; (5) what
the individual would have decided is ascertained through clear
and convincing evidence; and (6) a court enters an order allowing
the surrogate to exercise the individual's right to refuse or
terminate treatment. Longeway, 133 Ill. 2d at 47-53; Greenspan,
137 Ill. 2d at 16. 
 Thus, while legislative enactments improved and expedited
surrogate decision-making where advance directives were executed
through either a living will or power of attorney, individuals
not "covered" by either statute remained dependent on judicial
intervention and its attendant flaws. In response, the Illinois
Health Care Surrogate Act was passed in 1991. The Act codifies
Illinois' common law and constitutional rights to forgo life-
sustaining treatment and establishes a private decision-making
process allowing a surrogate to be chosen from a hierarchical
list of candidates to make life-sustaining treatment decisions
for those who lack decisional capacity and have not executed an
applicable living will or power of attorney. See In re C.A., 236
Ill. App. 3d 594, 622 (1992) (McMorrow, J., dissenting); 80 Ill.
Bar. J. at 127. 
 The Act applies when the individual lacks decisional
capacity, has not executed an advance directive and has a
"qualifying condition." "Qualifying condition" is defined as
follows:
 "the existence of one or more of the following 
 conditions in a patient certified in writing in the 
 patient's medical record by the attending physician and
 by at least one other qualified physician:
 (1) 'Terminal condition' means an illness or
 injury for which there is no reasonable prospect of
 recovery, death is imminent, and the application of
 life-sustaining treatment would only prolong the dying
 process.
 (2) 'Permanent unconsciousness' means a condition
 that, to a high degree of medical certainty, (i)
 will last permanently, without improvement, (ii) in
 which thought, sensation, purposeful action, social
 interaction, and awareness of self and environment are
 absent, and (iii) for which initiating or continuing
 life-sustaining treatment, in light of the patient's
 medical condition, provides only minimal medical
 benefit.
 (3) 'Incurable or irreversible condition' means an
 illness or injury (i) for which there is no reasonable
 prospect of cure or recovery, (ii) that ultimately will
 cause the patient's death even if life-sustaining
 treatment is initiated or continued, (iii) that imposes
 severe pain or otherwise imposes an inhumane burden on
 the patient, and (iv) for which initiating or
 continuing life-sustaining treatment, in light of the
 patient's medical condition, provides only minimal
 medical benefit." (Emphasis added.) 755 ILCS 40/10
 (West 1992).
 The Act further provides:
 "The determination that a patient has a qualifying
 condition creates no presumption regarding the
 application or non-application of life-sustaining
 treatment. It is only after a determination by the
 attending physician that the patient has a qualifying
 condition that the surrogate decision maker may
 consider whether or not to forgo life-sustaining
 treatment. In making this decision, the surrogate 
 shall weigh the burdens on the patient of initiating or
 continuing life-sustaining treatment against the
 benefits of that treatment." (Emphasis added.) 755 ILCS
 40/10 (West 1992).
 It is against this backdrop that we are asked to determine
whether, and to what extent, liability predicated on a health
care provider or physician's violation of the Act may be imposed. 
 Our review of an order of involuntary dismissal is de novo.
Dace International, Inc. v. Apple Computer, Inc., 275 Ill. App.
3d 234 (1995). In reviewing a dismissal pursuant to section 2-619
of the Code of Civil Procedure (735 ILCS 5/2-619 (West 1992)), we
must determine whether the allegations in the complaint, when
read in the light that most favors plaintiff, are sufficient to
set forth a cause of action upon which relief may be granted.
Regan v. Ivanelli, 246 Ill. App. 3d 798 (1993). 
 I. Plaintiffs' claims against the Hospital
 Count I of plaintiffs' second amended complaint is a
survival action brought on behalf of Ficke's estate which alleges
that the Hospital was negligent in (1) failing to obtain
certification of Ficke's "qualifying condition," (2) providing
treatment to Ficke contrary to the wishes of her children
(plaintiffs), (3) failing to inquire into the availability of a
surrogate, (4) failing to advise plaintiffs of their rights under
the Act, and (5) failing to effectuate Ficke's transfer to
another hospital. Count III of the complaint makes similar
allegations and is brought by plaintiffs in their individual
capacities for the anguish they each suffered as witnesses to
their mother's unnecessary suffering.
 To state a cause of action for negligence, a complaint must
allege facts sufficient to show the existence of a duty, a breach
of that duty, and an injury to the plaintiff that was proximately
caused by that breach. Kirk v. Michael Reese Hospital & Medical
Center, 117 Ill. 2d 507, 525 (1987). The Hospital moved to
dismiss counts I and III, maintaining that plaintiffs failed to
state a cause of action because the Act does not impose a duty on
hospitals prior to the finding and certification by the attending
physician that a patient lacks decisional capacity and has a
qualifying condition. 
 The question before us is largely one of statutory
interpretation. The fundamental canon of statutory construction
is to ascertain and give effect to the intention of the
legislature. Varelis v. Northwestern Memorial Hospital, 167 Ill.
2d 449, 454 (1995). Courts will look first to the words of the
statute (Metropolitan Life Insurance Co. v. Washburn, 112 Ill. 2d
486, 492 (1986)), for the language used by the legislature is the
best indication of legislative intent. Kirwan v. Welch, 133 Ill.
2d 163, 165 (1989). When such language is clear, no resort to
other tools of interpretation is necessary. Henry v. St. John's
Hospital, 138 Ill. 2d 533, 541 (1990).
 Section 25 of the Act requires the health care provider to
"make a reasonable inquiry as to the availability of possible
surrogates listed in items (1) through (4) of this subsection."
755 ILCS 40/25(a) (West 1992). However, this duty arises only
when "a patient has a qualifying condition and lacks decisional
capacity." 755 ILCS 40/25(a) (West 1992). The Act provides that
the "determination that an adult patient lacks decisional
capacity shall be made by the attending physician to a reasonable
degree of medical certainty." (Emphasis added.) 755 ILCS 40/20(c)
(West 1992). Further, "[t]he existence of a qualifying condition
shall be documented in writing in the patient's medical record by
the attending physician and shall include its cause and nature,
if known." 755 ILCS 40/20(e) (West 1992). The Act clearly, and in
mandatory terms, obligates the attending physician to medically
diagnose both lack of decisional capacity and the existence of a
qualifying condition, including its cause. We find this entirely
appropriate and almost inescapable since it is the physician's
province to treat and diagnose his or her patients. This is
particularly true when the determination involves a potential
life or death decision. 
 Accordingly, it is for the attending physician, not the
hospital or its staff, to determine whether the Act applies to a
particular patient. Absent the attending physician's
determinations that a patient lacks decisional capacity and
suffers from one of three qualifying conditions, the patient is
"presumed to have decisional capacity in the absence of actual
notice to the contrary without regard to advanced age." (Emphasis
added.) 755 ILCS 40/20(c) (West 1992); In re Estate of Austwick,
275 Ill. App. 3d 665, 668 (1995). Thus, contrary to plaintiffs'
argument, shared by the dissent, constructive "notice" or what
the Hospital perhaps should have known is insufficient to trigger
the Hospital's duties under the Act.
 The Act does not, as the dissent observes, require hospitals
to make "some effort to initiate the process of surrogate
decision making." (Slip op. at --). Conversely, initiation or
identification of the process of surrogate decision making is the
responsibility of the patient's attending physician. The
legislature is quite clear on this point, and we find such
delineation necessary to avoid potential conflicts between
physicians and other health care providers that might serve to
frustrate or prolong what was intended to be a swift, doctor-
patient diagnosis.
 Because there is no duty on the part of the hospital to 
inquire into the availability of a surrogate until a finding has
been made by the attending physician that the patient lacks
decisional capacity and has a qualifying condition, the trial
court was correct to dismiss the claims against the Hospital,
brought by both the estate and the plaintiffs individually.
 II. Plaintiffs' claims against Dr. Aruguete
 Count IV of plaintiffs' amended complaint alleges that
plaintiffs, as witnesses to Ficke's "continued pain and
suffering," were, by virtue of Aruguete's negligent conduct,
"caused to and did suffer grievous and painful injury, physical
and mental, and do and will, in the future, continue to so
suffer." Initially, we observe that the death of a parent is
indeed an event occasioned by the continued suffering or grieving
of the decedent's family. However, it is another matter whether
the Act authorizes a cause of action for such injury.
 The Act does not contain an express right allowing family
members of patients to assert a cause of action for violation of
its terms. However, a private right of action may be implied if
the plaintiff is a member of the class for whose benefit the Act
was enacted, the cause of action is consistent with the
underlying purpose of the Act, the plaintiff's injury is one the
Act was designed to prevent, and a cause of action is necessary
to provide an adequate remedy for violations of the Act. Corgan
v. Muehling, 143 Ill. 2d 296, 312-13 (1991); Sawyer Realty Group,
Inc. v. Jarvis Corp., 89 Ill. 2d 379, 391 (1982).
 Although we believe that a patient's estate has a private
right of action under the Act, the same cannot be said for a
patient's family members or loved ones. Although plaintiffs are
correct that the Act was intended to aid both the incompetent
patient and other "involved parties" (755 ILCS 40/5(a) (West
1992)), a cause of action for such "involved parties" was not 
similarly contemplated. 
 In the present case, allowing plaintiffs a cause of action
under the Act is not "necessary to provide an adequate remedy for
violations of the Act." Corgan, 143 Ill. 2d at 312-13. This can
be accomplished where a patient or a patient's estate brings a
direct action against a physician for violations under the Act.
Moreover, extending a cause of action to witnesses of a patient's
suffering raises serious practical concerns, including when and
for whom does one "draw the line"? That is, who is able to
maintain an action for damages? Immediate family members,
individuals with five or more visits to the patient's "death
bed," or only those friends or relatives who actually cared about
the decedent? At best, this would prove to be an inexact process
and one that conflicts with the traditional rule of limiting
claims in the medical arena to the "patient-hospital or patient-
doctor relationship." Kirk, 117 Ill. 2d at 528. Accordingly, we
affirm the trial court's dismissal of count IV.
 For the reasons set forth above, we affirm the trial court's
order of dismissal.
 Affirmed.
 GALLAGHER, J., concurs.
 CERDA, J., concurs in part and dissents in part.
 JUSTICE CERDA, concurring in part and dissenting in part:
 I concur with the majority's affirming of the dismissal of
counts III and IV, but I dissent on the affirming of the
dismissal of count I against Christ Hospital.
 A private right of action can be implied under a statute if
(1) plaintiff is a member of the class for whose benefit the
statute was enacted; (2) it is consistent with the underlying
purpose of the statute; (3) plaintiff's injury is one the statute
was designed to prevent; and (4) it is necessary to provide an
adequate remedy for violations of the statute. Corgan v.
Muehling, 143 Ill. 2d 296, 312-13, 574 N.E.2d 602 (1991). When a
statute is enacted for the protection of a particular class of
individuals, a violation of its terms may result in civil
liability even if that remedy is not mentioned in the statute. 
Corgan, 143 Ill. 2d at 313, citing Heimgaertner v. Benjamin
Electric Manufacturing Co., 6 Ill. 2d 152, 155, 128 N.E.2d 691
(1955). It is not necessary to show a specific legislative
intent to create a private right of action. Sawyer Realty Group,
Inc. v. Jarvis Corp., 89 Ill. 2d 379, 386, 432 N.E.2d 849 (1982). 
If there is no indication that the remedies available are only
those expressed in the statute, then where it is consistent with
the statute's underlying purpose, a private right of action can
be implied. Sawyer, 89 Ill. 2d at 386. 
 The public policy underlying certain statutes demands
implication of a private remedy to compensate an aggrieved person
who belongs to the class of persons whom the statute was designed
to protect. Sawyer, 89 Ill. 2d at 386-87. Consideration of the
underlying policy of the statute and the overriding purpose is
important in determining whether a private right of action
exists. Sawyer, 89 Ill. 2d at 387. Illinois courts have
continually demonstrated a willingness to imply a private remedy
where there exists a clear need to effectuate the purpose of a
statute. Sawyer, 89 Ill. 2d at 389. 
 I conclude that there is a viable cause of action for a
patient who lacks decisional capacity and who has a qualifying
condition when health care providers did not comply with the
Act's requirements. Dorothy Ficke was a member of the class for
whose benefit the statute was enacted. A private cause of action
is consistent with the underlying purpose of the statute, the
injury to Dorothy Ficke is one the statute was designed to
prevent, and a private cause of action is necessary to provide an
adequate remedy for violations of the statute. 
 Count I against the hospital alleged that Dorothy Ficke
lacked decisional capacity and suffered from a qualifying
condition within the meaning of the Act in that she was "lacking
in communication of meaningful thought, social interactions
and/or awareness of self and her environment." For such a
patient, the health care provider, which is defined as including
not only physicians but nurses and hospitals (755 ILCS Ann. 40/10
(West Supp. 1996)), must make a reasonable inquiry as to the
availability and authority of a health care agent or, if
unavailable, the availability of possible surrogate decision
makers. 755 ILCS Ann. 40/25(a) (West 1992). 
 The hospital argues that this duty of health care providers
is not triggered before the existence of the qualifying condition
and the lack of decisional capacity is certified in writing in
the patient's medical record by the attending physician and by at
least one other qualified physician. While it is only after
these written certifications are made that a surrogate decision
maker may consider whether to forgo life-sustaining treatment
(755 ILCS Ann. 40/10 (West Supp. 1996)), the hospital need not
and should not wait to make the reasonable inquiries until the
written certifications are made when the hospital knows or should
know that the patient in its care lacks decisional capacity and
probably has one of the three qualifying conditions. 
 Although the attending physician is in charge of a patient's
treatment, the hospital has sufficient knowledge of the condition
of its patients to determine whether it is probable that a
surrogate decision maker is needed. Nurses monitor the patient's
condition, and physicians and nurses make notes in the patient's
medical record. Hospitals should facilitate the process of
surrogate decision making and should not be allowed to sit by and
disregard the rights of a patient. The Act requires hospitals to
make some effort to initiate the process of surrogate decision
making. I would reverse the circuit court order dismissing Count
I against Christ Hospital.