*In re* ESTATE OF GEORGE EDWARD ROBERTSON, a disabled person (Julie Robertson Fletcher, Cross-Petitioner—Appellant, v. Mary Ellen Robertson, Plenary Guardian of the Person and Estate of George Edward Robertson, a Disabled Person, Petitioner-Appellee).

First District (3rd Division)   No. 85—1463

Opinion filed May 14, 1986.

Pascucci & Evola, of Chicago (Vincent J. Pascucci, of counsel), for appellant.

Levin & Ginsburg, Ltd., of Chicago (Henry N. Novoselsky and Daniel H. Brennan, Jr., of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Mary Ellen Robertson filed a petition, and her daughter Julie Robertson Fletcher filed a cross-petition, each seeking to have George Edward Robertson, the petitioner's father-in-law and cross-petitioner's grandfather, declared a disabled person and seeking to be appointed guardian of his person and estate. After a trial, the trial court found George to be disabled as of a date two years before the petition was filed, and appointed Mary Ellen as guardian. The court also ordered Julie, who had lived with George since 1976 and had assisted him with financial affairs, to file an accounting, and to turn over assets held in a joint tenancy savings account.

Julie appeals, contending that the trial court had no authority to enter a *nunc pro tunc* order adjudging George to be disabled; that the court erred in entering the turnover order; that the court erred in ordering Julie to file an accounting; and that the court's appointment of Mary Ellen as guardian, instead of Julie, was against the manifest weight of the evidence.

On June 14, 1984, Mary Ellen filed her petition, and the court appointed a guardian *ad litem* for George with a hearing set for July 12, 1984. Summons was placed for service on June 15, 1984. Service was attempted on June 20, 1984, but was returned, marked "not found."

On July 12, 1984, Julie and her husband Larry, who had lived with

Julie and George since 1978, appeared in court and submitted to its jurisdiction. The court ordered that all George's individual assets were to remain in status quo without transfer or encumbrance. The court also ordered an alias summons to issue upon George, and enjoined and restrained the Fletchers from directly or indirectly interfering with or preventing service of process on George. On July 14, 1984, however, Julie and George left Illinois for a Caribbean cruise. Julie testified that at the time they departed she was aware that the court order prohibited her from interfering with service of summons on George, but that she felt going on a cruise did not prevent service. On August 28, 1984, George was served.

On September 11, 1984, the court approved the report of the guardian *ad litem*. The guardian *ad litem* reported that he first met with George on July 31, 1984, and then talked with Julie. He learned that all household bills were paid by Julie. Originally, George signed blank checks from his La Salle National Bank account, and Julie used those checks to pay bills. Later the La Salle National Bank account was transferred into a Bell Federal account held jointly by Julie and George. In addition to $38,000 in the Bell Federal account, there was $11,000 in a Citicorp joint account, but Julie had pledged this account as collateral for a car loan and other advances. Additionally, George had given Julie bonds which she converted to a certificate of deposit. The certificate was held as security for a $35,000 loan to Larry, which he used to start a tool business. The guardian *ad litem* concluded that George was in good health, happy in his home and did not need a guardian of his person. He did, however, recommend that a guardian be appointed for George's estate because he could not manage his financial affairs. "He was in poor memory and does not have the slightest idea of the location or the size of his assets. The informal manner in which his bills and expenses are paid do not adequately protect his estate." At the same hearing, Julie was granted leave to file her cross-petition, in which she asked to be appointed guardian.

On November 27, 1984, Patricia Harvey, George's niece, was granted leave to intervene in the proceedings. She charged that the Fletchers had been aware of George's incompetency and took advantage of his condition by directing him to withdraw funds from a savings account at First National Bank of Chicago containing $10,000 held in joint tenancy with George and Patricia and transfer those monies to the Fletchers.

On December 19, 1984, Mary Ellen filed a motion to bifurcate the hearing on the petition for adjudication of disability and the petition for appointment of a guardian. The motion stated that Julie wrong-

fully transferred, depleted and otherwise converted the assets and funds of George, including three co-operative apartments, over $25,000 in bonds, and funds in accounts at Citicorp Savings, Bell Federal and Skokie Federal.

On January 3, 1985, the trial court granted the parties' joint motion to reschedule the hearing and that they be advised of the issues before the court. The agreed order also stated that both sides could amend their pleadings. Mary Ellen filed an amended petition which included allegations that Julie, who had acquired domination and control over George, had wrongfully converted assets and funds belonging to George. Mary Ellen requested that she be appointed guardian; that Julie be required to file an accounting of George's assets; and that constructive trusts be imposed on various assets wrongfully converted by Julie. Julie filed no answer to the amended petition, but George's counsel filed an answer signed and verified by counsel. The answer requested that Julie be appointed guardian and denied any wrongdoing on Julie's part.

The trial began, but George was not present because of recent surgery. George's counsel conceded that George was in need of a guardian because he was confused, senile, and in poor health. Apparently by agreement, the court stated there were two issues: which individual should be appointed guardian and the length of time George had been disabled.

Richard Gould, the guardian *ad litem*, testified to the facts and opinions contained in the aforementioned report. He also stated that when George was asked whether he owned any real estate, he only referred to the co-operative apartment in which he lived with Julie. George did not mention the other two apartments which Julie and he had purchased in 1984. Julie later testified that George did not attend the closings, but signed the papers at home.

Mary Ellen testified that she was employed in a company as a customer service representative, a position to which she was promoted after being hired as a secretary. Her duties included taking sales telephone calls, receiving complaints, talking to customers, placing orders, and correlating information with the purchasing department. She previously was employed as a secretary for a condominium management company and for Kelly services. When her husband died, Mary Ellen acted as administrator of his estate of $66,000. She invested this money in treasury notes and certificates of deposit at several banks, and used the proceeds from the investments for living expenses.

Elizabeth Doyle, Mary Ellen's supervisor, testified that Mary

Ellen was an excellent employee, showed a good grasp of business, and had a good reputation as to honesty. Her job required making calculations as to interest and discounts, and maintaining books and ledgers. Mary Ellen also chaired a task force committee addressing management problems in the office.

Mary Ellen testified further that she had known George since 1950 and had always had a good relationship with him. She saw him frequently for holidays and social gatherings, and provided extended moral support during George's wife's terminal illness. These visits with George were curtailed in April 1983 by the deterioration in the relationship between Mary Ellen and Julie.

Mary Ellen testified that her concern for George's welfare began in 1980, when he began losing weight and showing signs of being disoriented and forgetful. His hygiene and eating habits also suffered. He went to fast-food restaurants three or four times each day, and did not like to change his clothes or bathe. Julie often complained to Mary Ellen of problems in handling George, and that he became physically and verbally abusive to Julie. Mary Ellen's daughters Regan and Donna testified to similar facts. Mary Ellen testified further that George did not remember that his son was dead, and called his granddaughter Donna by his dead sister's name, Dolly. In June 1982, George was hospitalized, and Mary Ellen and Julie discussed George's disorientation, confusion, forgetfulness, listlessness, and aggressiveness.

Mary Ellen also testified as to the facts underlying her allegations regarding Julie. In 1976, George had Mary Ellen sign a signature card from Skokie Federal. He stated that he was opening a savings account in joint tenancy with Mary Ellen. Because George's wife and son were dead, he wished to leave his money to his family by setting up various joint tenancy savings accounts, as he did not believe in wills. Other witnesses testified that George opened similar accounts with his sister Helen Swanson, his granddaughter Donna, his niece Patricia Harvey, and his cousin Ellen McKee. All of these accounts were subsequently closed in 1982, and the funds were transferred to the joint account held by Julie and George, except for the joint account held with Mary Ellen. That account was closed in 1984.

In 1980, the Fletchers asked Mary Ellen to request George to use certain treasury bonds as collateral for a loan Larry needed to start a tool business. Mary Ellen spoke to George, and he pledged bonds in the amount of $30,000 as collateral, with the agreement that the bonds would be returned to Mary Ellen and her youngest child, Regan, when Larry's loan was repaid. Regan later testified to these

same facts. In April 1983, when Mary Ellen asked Julie about the loan repayment, Julie became angry and their relationship deteriorated. At that time, Mary Ellen asked George what interest rates he received on his funds, and he replied that he did not know where his money was kept. Since that time, Mary Ellen has not been able to speak to him on the telephone. Her telephone messages, left on the answering machine or with Julie, were not returned. She was not admitted to George's home. Mary Ellen believed that Julie had kept her from seeing George for 18 months. Regan and Donna testified to similar experiences. When in September 1984, through the attorneys, a visit was arranged for Mary Ellen to see George, he responded to a question about where his money was kept, "I don't have any money."

Regan Robertson testified that she visited George three or four times each week, and cleaned the apartment on Saturdays from September 1982 through April 1983. Julie rarely cooked for George. His sheets were often soiled, but apparently were only changed when Regan came on Saturdays. In the Spring of 1983, Regan stayed with Julie while Mary Ellen was on vacation. During this time, George frequently asked Julie about his money. Julie told Regan that George had struck her. Julie later testified that George did hit her. "If I needed hitting, he hit me." In December 1983, Regan noticed that Julie kept a padlock on the refrigerator and was told that George was eating during the night and getting sick in the morning.

Dr. Clair M. Rice, Jr., George's physician, testified that he treated George at Skokie Valley Hospital in June 1982 for fever and heart irregularities. Dr. Rice opined that, at that time, George was incapable of taking care of himself or handling his affairs. George was confused, sang songs, and asked the same questions over and over. Dr. Rice diagnosed the condition as cerebral arteriosclerosis, with mental confusion. In April 1984, Dr. Rice treated George in the hospital for a broken ankle, and found that he still suffered from the cerebral arteriosclerosis. Dr. Rice signed discharge papers for George on April 13, 1984, but was forced to extend George's hospitalization to April 16 because no one responded to the messages left on the answering machine at a telephone number which Dr. Rice had been told was the number for George's granddaughter.

Dr. Victoria Elliot testified on behalf of Julie regarding the four or five office visits she had with George since November 14, 1983. Julie told Dr. Elliot that George was hostile and argumentative at home, and Dr. Elliot prescribed a mild sedative. At that time, Dr. Elliot found George to be confused. In January 1985, Dr. Elliot examined George and concluded that he was probably not capable of handling

his own affairs. In her opinion, he had been suffering from senility since at least November 1983.

Julie testified that she moved in with George in 1976, when she was 20 years old, and began handling some of the finances. Julie opened charge accounts in the names of George and Julie Robertson at department and clothing stores. She bought household goods and clothing, bought clothing for George, and bought items for Larry on these accounts. The charge account bills were paid from funds obtained from George, Larry and rental of apartments owned by Julie and George.

When Julie first began paying all of their bills, she used blank checks from La Salle National signed by George. In June 1984, George closed that account because "he didn't want it anymore." In 1977 or 1978, George informed Julie that he had $35,000 in bonds and planned to put them in his name, Mary Ellen's name, and Regan's name. In September 1980, Larry obtained the loan for his business by putting the bonds up as collateral.

Julie also testified about George's various savings accounts. In 1976, George opened a joint account with Julie at First Federal, now known as Citicorp. The present balance is $12,000, and it stands as collateral for various loans having a balance of $10,000. The account had been pledged as collateral by Julie for personal loans four times. Each time the loans were renegotiated.

Julie testified further that in July 1982, George told Julie he was closing some of the joint savings accounts he had set up. These included the accounts with Donna, his sister, his niece, and his cousin. George stated that he would close the accounts and open up a new account in Julie's and his names. On July 8, 1982, more than $37,000 was withdrawn from the accounts and transferred into a joint tenancy account opened that same day in the names of Julie and George. Julie stated that she did not believe she helped George close most of the joint accounts, although he did close them by mail. In July 1984, the $14,000 account at Skokie Federal with Mary Ellen was closed. Julie first testified that she did not know how George obtained the documents to close the Skokie Federal account with Mary Ellen, but later testified that she typed a letter which George mailed to Skokie Federal. Julie also testified that George, a former auditor for the IRS, had not filed a tax return since 1979. Finally, Julie stated that she bought two additional apartments in their building in 1984 at a price of $40,000 each. George did not attend either closing.

Julie Irish, a friend of Julie's, visited Julie at least once each year for five years. During three visits in 1983 and 1984, Irish observed

George and felt he was then capable of handling his affairs. She testified that one night in June 1983, George awoke in the middle of the night, came to the room where Julie and Irish sat, and asked Julie about his money. Jann Johnson, a friend of Julie's who accompanied Julie and George on the cruise, testified that during 1983 and 1984 she saw George at least once a week and believed he was then capable of managing his affairs.

Mickey Likosar, a resident of George's building, visited with George occasionally and believed he was senile as of about six months before the trial. She also testified that George never mentioned his purchase of the two remaining co-operative apartments in their building.

The trial court then appointed Mary Ellen as plenary guardian of George's estate and person, and directed that the order include a finding that as of June 1982 George was incapable of making responsible decisions. The court directed that a separate order be prepared for an accounting by Julie "from June 1, 1982 forward on all the money in and all of the payments made for that period up to today."

On April 18, 1985, Mary Ellen, as guardian, filed a motion for the entry of order directing Bell Federal to turn over the proceeds of the account held in joint tenancy by George and Julie. Mary Ellen stated that she was expending her own funds for the care and support of George, and needed the Bell Federal funds for George's care. On the same day, the court entered an agreed order whereby Julie would respond to Mary Ellen's request for a turnover order within seven days, and Bell Federal would turn over $2,000 to Mary Ellen immediately.

On May 2, 1985, the trial court denied Julie's post-trial motion. The court then granted Mary Ellen's motion for a turnover order. Dr. John McMahon's report of April 24, 1985, was presented. The report stated that George had been treated by Dr. McMahon for the past month and was recovering from a hernia operation. George could not perform the most elementary functions of personal hygiene, could not dress, and often would not eat. His behavior swung from docility to loud aggressiveness. He was often confused and had no memory of recent events. Dr. McMahon concluded that George required 24-hour supervisory care and recommended that he be placed in a nursing home. Julie then filed a response to Mary Ellen's motion, contending that the validity of all transactions between George and her must be determined on a case-by-case basis, and that the Bell Federal funds were exclusively her property. The court found that the funds should be used for the care and support of George, and entered a turnover order. Julie appeals.

■■ ■ Julie first contends that the trial court erred in entering a *nunc pro tunc* order finding George to be disabled as of June 1982, while the petition was not filed until June 14, 1984. Initially, we note that the trial court did not enter a nunc pro tunc order. A *nunc pro tunc* order places in the record an order actually made earlier, but omitted from the record because of clerical error. (*In re Estate of Bird* (1951), 410 Ill. 390, 102 N.E.2d 329.) A *nunc pro tunc* order can only give effect to orders concededly entered. (*In re Estate of Young* (1952), 346 Ill. App. 257, 104 N.E.2d 850, *aff'd* (1953), 414 Ill. 525, 112 N.E.2d 113.) If there is no earlier order to which the *nunc pro tunc* order can relate back, use of such order would be improper. (*Harner v. Harner* (1982), 105 Ill. App. 3d 430, 434 N.E.2d 465.) Here, a *nunc pro tunc* order would have been inappropriate since no earlier adjudication of incompetency occurred. The record, however, does not indicate that the trial court entered such an order.

■ At the hearing for appointment of a guardian, the court may inquire into any area it deems appropriate. (Ill. Rev. Stat., 1985 Supp., ch. 110½, par. 11a—11(e)(6).) Furthermore, when the court appoints a plenary guardian, it shall enter a written order stating the factual basis for its findings. (Ill. Rev. Stat., 1985 Supp., ch. 110½, par. 11a—12(b).) In the present case, Julie filed a cross-petition, asking to be appointed guardian. Evidence of Julie's care for George and his finances from the time he was totally disabled would help indicate whether she would be a proper guardian for George. Thus, identifying the date George became totally disabled was a proper area of inquiry. The testimony of Mary Ellen, Regan, and Dr. Rice indicated that as of June 1, 1982, George suffered from cerebral arteriosclerosis and was incapable of taking care of himself or handling his affairs. Mary Ellen and the intervenor both raised the issue of Julie's failure to care properly for George's person and finances. In addition to Mary Ellen's and Regan's testimony about Julie's failure to take care of his person, Julie herself testified that she was in charge of paying the bills. Yet the guardian *ad litem* found that George's finances were not being handled properly.

■■ All the parties stipulated that George was disabled. The only issue was which party, Mary Ellen or Julie, would be the more appropriate guardian, which necessarily included the issue of when George became disabled. When Julie filed a cross-petition asking to be named guardian, submitted herself to the jurisdiction of the court, and entered into agreed orders establishing the issues, she invited or induced the court to make a finding as to when George became disabled. A party cannot later complain of such errors which she invited

or induced to the court to make. (*In re Estate of Bania* (1984), 130 Ill. App. 3d 36, 473 N.E.2d 489; *Peters v. Hokin* (1976), 41 Ill. App. 3d 995, 355 N.E.2d 205. See also *City of Waukegan v. Stanczak* (1955), 6 Ill. 2d 594, 129 N.E.2d 751.) We find no basis for reversing the trial court's judgment based on the fact that it found George to be disabled as of two years prior to filing the petition.

■■ We note that Julie's main concern appears to focus not on the trial court's power to make such a finding, but instead on the effect of that finding. The effect of the trial court's finding will be determined in the pending recovery citation proceedings and not in the present appeal. We discuss it briefly, however, because it could be raised in the citation proceedings.

Both parties agree that transactions occurring prior to an adjudication of incompetency must be viewed separately, as they are voidable and not void. (*Brandt v. Phipps* (1974), 398 Ill. 296, 75 N.E.2d 757; *In re Estate of DeKoekkoek* (1979), 76 Ill. App. 3d 549, 395 N.E.2d 113; *In re Estate of Payton* (1979), 79 Ill. App. 3d 732, 398 N.E.2d 977; *Barth v. Gregory* (1979), 79 Ill. App. 3d 510, 398 N.E.2d 849.) This is because in the absence of a proceeding to declare a person incompetent, people dealing with him have a right to rely on the presumption that a person is competent. (2 H. Horner, Probate Practice sec. 1046, at 463 (1983).) Contrary to Julie's contentions, however, the trial court did not rule that all transactions George entered into after June 1, 1982, forward were void. It merely made a finding to support its appointment of Mary Ellen as guardian.

In a later proceeding, the court may find George to be mentally incompetent as of a date prior to the incompetency hearing, thus voiding a specific transaction. (See, *e.g., Fisher v. Burgiel* (1943), 382 Ill. 42, 46 N.E.2d 380.) In an action to set aside a deed, it is proper to admit into evidence an order adjudging a person to be incompetent, notwithstanding the fact that the adjudication occurred after the execution of the deed. (*Citizens National Bank v. Pearson* (1978), 67 Ill. App. 3d 457, 384 N.E.2d 548, citing *Redmon v. Borah* (1943), 382 Ill. 610, 48 N.E.2d 355 and *Greene v. Maxwell* (1911), 251 Ill. 335, 96 N.E.2d 227. See generally 3 W. James, Illinois Probate Law & Practice sec. 113.10, at 360-362 (1951) (adjudication of incompetency has no conclusive effect upon acts of ward prior to adjudication; contracts are voidable).

■■ Julie next contends that the trial court erred in entering the turnover order. The issues relating to jointly owned property may be submitted by the conservator to the court, which will then decide whether the joint funds are necessary for the support and mainte-

nance of the incompetent. (*In re Estate of Hirsh* (1960), 27 Ill. App. 2d 228, 169 N.E.2d 591.) In the present case, Mary Ellen as guardian properly submitted this issue to the court in her motion for a turnover order. The court thereafter considered the source of the funds remaining in the Bell Federal account, including the large sums transferred into the account in July 1982 and July 1984, and George's monthly pension and social security checks which had been deposited in that account for years. The court also considered Dr. McMahon's report stating that George needed 24-hour care, and the fact that Mary Ellen was expending her own funds for that care. The court heard arguments on both sides, and properly concluded that the money was necessary for George's maintenance and support.

■■ Julie next contends that the trial court erred in ordering her to file an accounting. This order, however, is not subject to appeal. (*In re Estate of Moses* (1973), 13 Ill. App. 3d 137, 300 N.E.2d 473.) The order requiring an accounting that contemplates future action is not final and not appealable. (*In re Estate of Moses* (1973), 13 Ill. App. 3d 137, 145, 300 N.E.2d 473, citing Illinois Supreme Court Rule 304(b) (87 Ill. 2d R. 304(b)).) Under Rule 304(b)(1), interlocutory orders entered in the administration of an estate or guardianship are only subject to appeal as a matter of right when such order finally determines a right or status of a party. (*Estate of Oster* (1984), 122 Ill. App. 3d 799, 461 N.E.2d 1073.) For these reasons, we do not address this issue further.

■■ ■ Finally, Julie contends that the trial court's appointment of Mary Ellen as the guardian, instead of Julie, was against the manifest weight of the evidence. Selection of a guardian lies within the discretion of the trial court. (*In re Estate of Bennett* (1984), 122 Ill. App. 3d 756, 461 N.E.2d 667; *In re Estate of Vicic* (1979), 79 Ill. App. 3d 383, 398 N.E.2d 420.) That selection will not be disturbed absent abuse of the court's discretion. (*In re Estate of Lamont* (1973), 13 Ill. App. 3d 714, 300 N.E.2d 574.) The best interest and welfare of the incompetent person is of paramount concern in selecting a guardian. (*In re Conservatorship of Browne* (1977), 54 Ill. App. 3d 556, 370 N.E.2d 148.) The court may consider such factors as past actions and conduct of proposed guardians, business experience, ages, and family situations. *In re Estate of Vicic* (1979), 79 Ill. App. 3d 383, 398 N.E.2d 420.

■■ Evidence of fraudulent conduct or bad faith in prior dealings between a proposed guardian and the incompetent will preclude her selection as guardian. (See *Proehl v. Leadley* (1967), 86 Ill. App. 2d 472, 230 N.E.2d 516.) Ample evidence was presented to support alle-

gations of bad faith in Julie's prior dealings with George. For example, George's joint tenancy accounts with his sister, granddaughter, sister-in-law, niece and cousin all were destroyed and the balances placed in an account in the name of Julie and George. Those assets were used for such purchases as a Caribbean cruise, charge accounts for Julie and George, and co-operative apartments held in the name of Julie and George.

Moreover, Julie has a pecuniary interest adverse to George in that his guardian will institute proceedings to recover monies received by Julie, and compel an accounting from Julie. A guardian should have no pecuniary or other adverse interest which would impair his ability to protect the incompetent's interests. *In re Estate of Bania* (1984), 130 Ill. App. 3d 36, 473 N.E.2d 489; *Proehl v. Leadley* (1967), 86 Ill. App. 2d 472, 230 N.E.2d 516.

Finally, Mary Ellen's business experience far exceeds that of Julie. Mary Ellen has had substantial experience both in her employment and in the administration of her husband's estate. Julie, on the other hand, handles George's financial affairs, yet demonstrated an exceptional lack of knowledge and expertise relating to George's or her own finances. Her uncertainty as to the details of household financial matters contrasts sharply with her assertion that she properly handles the day-to-day financial affairs for George. She helped transfer large sums of money, used stacks of signed blank checks for years, paid bills and ran the household, yet apparently she knew or remembered very little about their finances. Her testimony portrays an inexperienced person who would not be capable of handling George's estate in a manner that would be in his best interest. We conclude that the trial court did not abuse its discretion in appointing Mary Ellen as guardian of George's estate and person.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGILLICUDDY and WHITE, JJ., concur.