No. 2--97--0757

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

In re
 CYNTHIA SCHMIDT, Alleged ) Appeal from the Circuit Court

to be a Disabled Adult ) of McHenry County. 

) 

(William Pilarski, Petitioner- ) No. 97--PR--177

Appellant, v. Thomas Schmidt, )

Respondent and Counter- )

petitioner-Appellee; James )

Kelly and Rehabilitation )

Institute of Chicago, ) Honorable

Respondents). ) Michael J. Sullivan, 

) Judge, Presiding. 

_________________________________________________________________

JUSTICE RATHJE delivered the opinion of the court:

On May 30, 1997, petitioner, William Pilarski (William), filed a petition to be appointed guardian of the person of his sister, Cynthia Schmidt (Cindy), alleged to be a disabled adult.  Cindy was involved in an automobile accident on April 11, 1997, in which she suffered severe head trauma.  The petition alleged that she was in a comatose state.  Respondent, Thomas Schmidt (Tom), Cindy's husband of three years, filed a counterpetition to be appointed Cindy's guardian, alleging that Cindy was in a vegetative state.  On June 17, William filed an amended petition to substitute Cindy's sister, Sheryl Strack (Sheryl), as the proposed guardian.

After an evidentiary hearing and consideration of the report of Cindy's guardian 
ad litem
 (GAL), Jeannine A. Thoms, on July 8, 1997, the trial court found that Cindy was a disabled person and found Tom to be qualified to act as guardian.  The court appointed Tom as the plenary guardian of the person and estate of Cindy and denied William's petition to appoint Sheryl.  The court further ordered that Cindy's family members be notified 72 hours in advance of any action taken pursuant to the Health Care Surrogate Act (Surrogate Act) (755 ILCS 40/1
 
et seq
. (West 1996)), which governs private decision making for withdrawing life-sustaining treatment on behalf of a patient lacking decisional capacity.  The court ordered that any decision pursuant to the Surrogate Act be based on current medical evaluations and certification and be in compliance with the Act.  The court ordered that Sheryl be given reasonable access to Cindy's medical records, but granted her no authority regarding medical decisions.  The court's order also established a visitation schedule for Tom, Mandy (Cindy's daughter, Amanda), and Cindy's other relatives. 

William timely appeals.  He argues that (1) the court erred in appointing Tom because neither the provisions of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a--1 
et seq
. (West 1996)) 
nor those of the Surrogate Act create a preference for the appointment of a spouse as guardian (implicating an evidentiary burden for the nonspouse to overcome); and (2) the court failed to make a determination regarding which proposed guardian would most likely follow the dictates of the the Probate Act (755 ILCS 5/11a--3(b), 11a--5 (West 1996)) and the Surrogate Act (755 ILCS 40/20(b)(1) (West 1996)) in caring for Cindy.  We disagree, and we affirm. 

At the hearing, Tom testified initially as an adverse witness.  Cindy was then at the Glen Oaks Nursing Home (Glen Oaks) in Northbrook, and her treating physician was Dr. Velasco.  Tom was  acting as her surrogate in making medical decisions.  He believed it was in Cindy's best interest that her medical records remain  confidential, but he allowed his sister-in-law, Toni Schmidt (who was completing an R.N. degree) to see the records; Toni had been with Tom since the accident.  Tom had previously given do-not-resuscitate (DNR) orders to the staff at Centegra Hospital, the Rehabilitation Institute of Chicago (RIC), and Glen Oaks.  If named Cindy's guardian, his goal was to take care of her.  This would include withdrawing nutrition, hydration, and medication upon the medical advice of two physicians.  As surrogate he would try to make health care decisions in the same way that Cindy would make them.  Based on his prior discussions with Cindy and her daughter Mandy, Tom stated that Cindy does not wish to be kept alive by artificial means.  She had informed them that, if she were disabled, she would want Tom and Mandy to care for her, and, if she were in a vegetative state, she would not want to live that way; that was not "life."  She did not say what she would do if she were in a vegetative state but was recovering from that state.  Tom agreed that Cindy had a close relationship with her daughter Mandy, her mother, her sister Sheryl, and her Aunt Kathy.

Tom received training at the RIC regarding Cindy's care.  He acknowledged that he expressed his intention to terminate life support for Cindy.  On June 25, 1997, he had a dispute with Cindy's family at Glen Oaks regarding Cindy's attire in relation to the temperature in the room.  He was concerned about her modesty because of the way the interns picked her up and moved her around, leaving her exposed.  Since then, in order to avoid confrontations, he arranged with Glen Oaks not to have Cindy's family there when he wished to visit.  He denied being estranged from Cindy.  His understanding of Cindy's wishes was that she would not wish to be placed on a respirator to help her breathe.  However, during the first few days after the accident she was placed on a respirator; the respirator was later removed. On redirect-examination, Tom stated that the DNR and other medical decisions were based on the opinions and recommendations of Cindy's treating physicians.  Tom wanted to have Cindy wear the everyday attire she had worn at the RIC.  He had visited her there daily.  

Cindy's mother, Sally O'Neill, who lives in Arizona, testified that, based on her discussions with Cindy, she would want everyone to care for her and continue with the care she was getting.  Sally  acknowledged that Cindy would not want to live on life support. Sally had previously observed Tom get upset with Cindy, and he would sleep on the couch.  He would call her a "dumb blonde" and became irritated when Cindy did not play cards the way he thought she should. 

Kathleen Marie Lagerman (Kathy), Cindy's aunt who lives in Arizona, testified that she had a conversation with Tom at Centegra Hospital in Woodstock on April 14, 1997.  In discussing Cindy's condition, he stated that, if she were not going to be herself, he would "end it" and disconnect her feeding tubes.  Kathy was a nurse's aide.  On July 4, 1997, she told Cindy to blink her eyes and open them if she knew it was Kathy.  Kathy observed Cindy blink her eyes and open them in response to her question.  In response to a "no" question, Cindy motioned her head from right to left.  Kathy had worked with Cindy in a nursing home several years before.  Cindy said she would never want to live like the patients who were unable to speak or communicate.  Kathy observed Cindy cry a lot while visiting in Arizona.  Tom wanted Cindy to be with him and to know where she was all the time.  He made "dumb blonde" jokes about her. 

Diane Haase, Cindy's sister, testified that she held an LPN. degree and had practiced nursing until six years before.  On May 29, after a family meeting, Tom stated he felt it necessary to call the family to inform them of his decision.  He did not believe Cindy's chances were good, and he planned on pulling her feeding tube and letting her go.  On May 30 at the RIC in the presence of other siblings, he stated that he would let Cindy have six months or possibly a year as recommended by Dr. Kelly and that no one should be upset because he wanted what was best for Cindy. 

The last time that Diane visited Cindy, she felt Cindy move her thumb over her fingers.  She asked Cindy to close her eyes for "yes" in response to her asking Cindy whether she knew Diane was there, and Cindy responded by closing her eyes.  She had not been able to respond that way after the accident.  When they worked together in nursing, Cindy said she would not want to live on a ventilator, but if she had the opportunity, she would allow feeding tubes and other types of rehabilitation.  If she had a 50% chance of coming out of a coma, she would want to be given the opportunity to do so.  On cross-examination, Diane stated Cindy would not want to be unable to communicate with the world and would not want to continue living in that state. 

Stacy Strack, Cindy's sister, visited Cindy after the accident.  She videotaped Cindy on June 29 at Glen Oaks, and the tape was played before the court to depict Cindy's condition. (The tape is not part of the record on appeal.) 

Sheryl Strack, Cindy's sister and proposed guardian, testified that she was an activity director at a nursing home in Belvidere.  On April 15, 1997, at the Centegra Hospital in Woodstock, Tom told her he did not think Cindy would be able to live on the respirator, and he wanted to take her off the respirator to see if she survived.  At the hospital the following week, Tom made jokes about the shunt that Cindy had in her brain after she came out of surgery.  Sheryl also testified that Cindy responded to her questions by closing and opening her eyes.    Sheryl wanted to move Cindy to a rehabilitation hospital.  She did not intend to withhold nutrition, water, and medication in order to allow her to die.  She thought Tom wanted to end her life prematurely and that he was a controlling person.  About five years before, Cindy had told her that she would not want to live in a vegetative state or on life support, but she would want to be given a chance if she was able to communicate in any manner.  Sheryl believed Cindy loved her husband, but Cindy was unhappy about how he treated her. 

Dan Martinez, Cindy's brother, testified regarding Tom's irate behavior toward Cindy when they played cards.  Tom told him Cindy would die in a nursing home, and Tom would have her buried with a tombstone engraved, "Here lies Cindy Schmidt who died at the unmerciful hands of her brothers and sisters."  Dan acknowledged that Cindy told him she knew Tom loved her or knew that he cared for her, "but it was hard."

Tom testified that he and Cindy were married in April 1990.  He had met her two years before that.  He considered their marriage to be happy and successful.  They were never separated nor did they ever seek counseling.  During the past year, he and Cindy had a conversation in which she stated that, if she were disabled, she would like Tom and her daughter Mandy to take care of her.  She would not want to live in a vegetative state.  Cindy sent Tom many cards and letters.  A card she sent to Tom on March 21, 1997, stated, "I don't mistrust you.  I trust you with my life.  You are my life."  Tom testified that anything he had done regarding Cindy's care was based on medical opinion and was in her best interest.  Anything done in the future would likewise be based upon medical opinions and recommendations and based on Cindy's best interest.  Tom had pet names for her, including "Booba" and "dumb blonde."  She would make faces in response to the names and make light of them.  He visited her daily at the RIC and took many hours of training there to learn how to care for her.  Tom took a leave of absence from his job to care for her after he used up his vacation and holiday time. His sister-in-law, Toni, also saw her daily in rehabilitation. 

Amanda Kay Hoffman (Mandy), Cindy's daughter, testified that  Cindy and Tom had a happy marriage, that her mother was happy and trusted Tom. Mandy was 17 years old. She had a close relationship with her mother. They talked sometimes about the arguments between Cindy and Tom, but Cindy never indicated she wanted a divorce or a separation.  After a television movie about a car accident, Cindy stated she never wanted to live on any kind of life support. If she were ever disabled, Cindy wanted Tom and Mandy to care for her. Based on the records she had seen, she believed Cindy was "brain dead."  Cindy took the "dumb blonde" phrase as a joke.  Cindy had been married several times. Mandy's relationship with Tom was "okay," and she intended to remain with Tom at their home.  There were adoption proceedings in progress, and Mandy did not object to the adoption.  Tom spoke to her most of the time regarding the medical decisions, and Mandy agreed with Tom's position.  

The parties stipulated to the admission of certain medical records, but no medical testimony was offered.  The court considered the detailed written report of the GAL. The GAL interviewed Tom and other family members as well as
 Dr. James Kelly and caseworkers at the RIC and Dr. Pederson, who was Cindy's surgeon and attending physician at Centegra prior to her transfer to RIC.  She also reviewed Cindy's medical tests.  When neurosurgery was performed after the accident, Cindy's brain swelled so severely that the portion of the skull that had been removed was never replaced.  After her transfer to the RIC, Dr. Kelly advised that Cindy was in a severe vegetative state, and he did not anticipate recovery from this state--in contrast to Dr. Pedersen's more optimistic view upon which the siblings had relied.  According to the report of the GAL, Dr. Kelly explained that, in a vegetative state, a person can have base reflexes, such as opening the eyes, that distinguish persons in a coma. 

Dr. Pedersen explained to the GAL that reflexes such as yawning, gagging, doll eyes, and response to severe pain could be base reflexes and not necessarily an indication of improvement.  He related that he told the family that Cindy was going to the RIC for two weeks and that she may improve, but if at the end of two weeks there were no changes, this would be a strong indication that she was not going to have a hopeful recovery.  Dr. Pedersen explained to the GAL the limitations of MRI testing at Centegra, and he did not understand why the family misinterpreted his prognosis. 

According to the report, Tom and Toni took excellent care of Cindy.  The report also related that Mandy stated Cindy had been married four times, and this marriage to Tom was by far the best. The GAL concluded that it would be in Cindy's best interest to appoint Tom as guardian of her person and estate. 

After hearing the arguments of counsel, the court found that Cindy was in need of a guardian due to her brain injury resulting from the accident.  The court took note of the tension in the family and the apparent disagreement as to the best course of action.  The court noted that the situation did not involve strangers, but all close relatives.  The court pointed out that, under the Probate Act, in cases involving decedents' estates there is a preference for the appointment of spouses and, under the Surrogate Act, there also exists a preference for spouses.  The court opined that both logic and the law indicated "at least some preference for the spouse" and further commented, "I don't see that there has been anything that would overcome that."  In appointing Tom as Cindy's guardian, the court noted that the issue then before it was the appointment of a suitable person as guardian. In viewing the videotape, the court was unable to determine the significance of the eye movement and observed that medical decisions should best be left to the medical experts and there would need to be further current and ongoing medical evaluations.  

On appeal, William first argues that the court erred in basing its decision on a preference for the appointment of a spouse as guardian because there is no basis for such a preference either under the Probate Act or the Surrogate Act.  In support of his position, William cites 
In re Conservatorship of Browne
, 54 Ill. App. 3d 556 (1977). 

Section 11a--5 of the Probate Act provides that a person may be appointed to act as guardian if that person has attained 18 years of age; is a resident of the United States; is not of unsound mind and is not adjudged a disabled person under the Act; has not been convicted of a felony; and the court finds that person  capable of providing an active and suitable program of guardianship for the disabled person. 755 ILCS 5/11a--5 (West 1996).  The petition for the adjudication of disability and for the appointment of a guardian must state 
inter alia
 the name and post office addresses of the nearest relatives of the respondent in the following order: (1) the spouse and adult children, parents and adult brothers and sisters, if any; and, if none, (2) the nearest adult kindred known to the petitioner. 755 ILCS 5/11a--8 (West 1996). 

Section 11a--12(d) of the Probate Act provides that the selection of the guardian shall be in the discretion of the court, "which shall give due consideration to the preference of the disabled person as to a guardian, as well as the qualifications of the proposed guardian."  755 ILCS 11a--12(d) (West 1996).  Although a court is required to consider the disabled person's preference, it is not bound by that preference.  
In re Estate of Bennett
, 122 Ill. App. 3d 756, 760 (1984). 

No question is raised regarding Cindy's disability and the need for a guardian.  The question here is whether the trial court abused its discretion in selecting Tom as Cindy's guardian.  
In re Estate of Robertson
, 144 Ill. App. 3d 701, 712 (1986).  An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court.  
In re Marriage of Carpenter
, 286 Ill. App. 3d 969, 973 (1997).  

The best interest and welfare of the disabled person is the paramount concern in selecting a guardian.  
Browne
, 54 Ill. App. 3d at 560.  Under that standard and under legally prescribed conditions, a guardian acting as surrogate may exercise the patient's right to refuse medical treatment including artificial nutrition and hydration.  
In re Estate of Greenspan
, 137 Ill. 2d 1, 16 (1990); see 755 ILCS 40/20 (West 1996).  In appointing a guardian, a court may consider such factors as past actions and conduct of the proposed guardians, business experience, ages, and family situations.  
Robertson
, 144 Ill. App. 3d at 712.  Among the factors to be considered is the degree of relationship between the disabled person and the proposed guardian, and serious consideration should be given to any conduct by the disabled person prior to the adjudication manifesting trust or confidence in the proposed guardian as well as prior conduct by the proposed guardian indicating a concern for the well-being of the disabled person.  
In re Estate of Vicic
, 79 Ill. App. 3d 383, 385 (1979). 

In 
Browne
, the reviewing court determined that the trial court's appointment of the incompetent's attorney as her conservator was in her best interest where he was the preference of the relatives and the incompetent had previously manifested her trust in him in his management of her legal affairs while she was still competent.  The reviewing court declined to adopt the rigid statutory preferences for awarding letters of administration of a decedent's estate found in section 9--3 of the Probate Act then in effect.  Ill. Rev. Stat. 1975, ch. 3, par. 9--3 (listing the order of preference, including the nominees of each class of persons: surviving spouse, children, legatees, grandchildren, parents, brothers and sisters, nearest kindred, representative of the estate of deceased ward, public administrator, creditor of estate). The current statute contains essentially the same hierarchy.  755 ILCS 5/9--3 (West 1996).  

As a stranger, the attorney would fall below the public conservator in the hierarchy of persons to be considered if the statutory preferences were applied.  However, based on the quality of the attorney's  previous relationship with the incompetent, the 
Browne
 court nevertheless upheld the attorney's appointment as consistent with the best interest of the incompetent.  The court stated that the recommendations of persons with kinship or familial ties are to be considered by a court when selecting a conservator because "it is presumed that such persons are likely to be more solicitous of the incompetent's welfare than would be someone else."  
Browne
, 54 Ill. App. 3d at 559-60; see 
In re Estate of Debevec
, 195 Ill. App. 3d 891, 898 (1990).  However, in the case before it, the court focused on the closeness of the personal ties between the incompetent and the proposed conservator (guardian) as an appropriate factor in selecting the conservator.  

In specially concurring with the result but not the rationale of the decision, Justice Barry opined that, as a matter of public policy, the preference given to relatives in obtaining and nominating others for letters of administration should also apply to obtaining, or nominating others, for the letters of conservatorship.  
Browne
, 54 Ill. App. 3d at 561 (Barry, J., specially concurring). 

While the
 
Browne
 majority rejected the rigid statutory hierarchy of section 9--3 of the Probate Act as a basis for appointing a guardian, the court did determine that the closeness of the ties between the disabled person and the proposed guardian--including familial ties--was a factor to be considered.  The court cautioned that, if the evidence established that the relative seeking a preference had theretofore been relatively unconcerned about the incompetent, his recommendation should be accorded much less weight than a relative who had maintained close personal ties with the incompetent.  
Browne
, 54 Ill. App. 3d at 560. 

Browne
 does not directly address the question before us, where the appointment of a guardian involves a contest between the spouse and a sibling of the disabled person.  We observe in passing that a husband has the same relation by affinity to his wife's blood relatives as she has to them by consanguinity, and vice versa.  See  
Calloway v. Allstate Insurance Co.
, 138 Ill. App. 3d 545, 547-48 (1985); 
State v. Hooper
, 140 Kan. 481, ___, 37 P.2d 52, 64 (1934).  We too reject the rigid application of the statutory preferences presently found in the Probate Act and the Surrogate Act in appointing a guardian.  Nevertheless, we believe the trial court could properly consider the degree and quality of the relationship between Cindy and the proposed guardian as one of several factors in making the appointment. To the extent that the statutes governing the appointment of a guardian are silent, it was not error for the court to consider the public policy expressed in these related Acts in guiding its decision.

According to William, nothing in the 
Browne
 decision states that relatives are preferred in the naming of a guardian, but rather, that court ruled that the input of relatives in choosing a guardian should be carefully considered. William further argues that a majority of Cindy's "close" relatives, including her mother, aunt, brother, and three sisters, preferred her sister Sheryl as guardian.  By contrast he notes that only Cindy's husband Tom and her minor daughter Mandy testified in favor of appointing Tom.  William concludes, incorrectly we believe, that the trial court therefore disregarded the preferences of Cindy's relatives.   Tom and Mandy are relatives.  We do not believe that the roles of the husband and daughter (and their preferences) are of less consequence merely because a purported majority of Cindy's other relatives preferred the appointment of Sheryl.  As we shall explain further, the spousal relationship is one that the trial court could properly consider insofar as it reflects the closeness of the ties between the disabled person and the proposed guardian. 

William next argues that the Surrogate Act does not create a preference for the appointment of the spouse as guardian. The Surrogate Act sets forth a hierarchy of persons allowed to make the decision whether to forgo life-sustaining treatment on behalf of a person with a statutory qualifying medical condition who lacks decisional capacity.  755 ILCS 40/25(a) (West 1996).  The Surrogate Act applies only where the disabled person has no agent previously appointed under the Powers of Attorney for Health Care Law (755 ILCS 45/4--1 
et seq
. (West 1996)) or has no operative living will pursuant to the Illinois Living Will Act (755 ILCS 35/1 
et seq
. (West 1996)). 

Section 25(a) of the Surrogate Act directs that, when a patient has a qualifying condition and lacks decisional capacity and no health care agent is authorized and available, the health care provider must make a reasonable inquiry as to the availability of possible surrogates, as identified by the attending physician.  The surrogate may make decisions whether to forgo life-sustaining treatment on behalf of the patient without judicial involvement.  The provider may rely on any of the listed surrogates if the provider believes after reasonable inquiry that no health care agent or surrogate of higher priority is available. 755 ILCS 40/25(a) (West 1996). 

The order of priority for surrogate decision makers is as follows: (1) the patient's guardian of the person; (2) the patient's spouse; (3) any adult son or daughter of the patient; (4)  either parent of the patient; (5) any adult brother or sister of the patient; (6) any adult grandchild of the patient; (7) a close friend of the patient; (8) the patient's guardian of the estate. 755 ILCS 40/25(a) (West 1996).  William correctly points out that  Illinois law first prefers a surrogate decision maker or agent appointed by the disabled person before the disability occurred.  That preference supersedes any other preference for persons in the hierarchy, including a guardian, spouse, or sibling.  

In the present case, there was no previously designated agent for health care and no living will known to be extant.  Thus, by operation of law, health care providers could reasonably rely on the surrogate decision-making authority of Tom as Cindy's spouse, in the absence of judicial intervention. We emphasize that the Surrogate Act does not control the appointment of a guardian.  However, it does express the legislature's intent that the nature of the relationship between the disabled person and the decision maker be given consideration when the care and best interest of a disabled person are in question.  In view of the statutory preferences given to spouses in closely related areas of the law, such as the administration of decedent's estates and surrogate decision making, we are loath to say that the court erred in considering Tom's spousal relationship as a factor in making the appointment.  The law accords a preferential status to spouses over other close relatives under the laws of testacy and intestacy, for example. This is because the law recognizes the special and peculiarly intimate nature of the relationship they share.  See 
In re Estate of Glogovsek
, 248 Ill. App. 3d 784, 794-95 (1993) (in will contest, spousal relationship militated against presumption of undue influence by testator's wife).  

We do not believe the trial court was required to close its eyes to the public policy of this state regarding spousal preferences and to the reality of the relationship between husband and wife.  See 
In re Estate of Greenspan
, 137 Ill. 2d 1 (1990) (supreme court considered public policy expressed in related statutes in determining whether public guardian could properly petition court to withdraw nutrition and hydration from incompetent ward).  We hasten to add that this spousal relationship is only one of several factors that a court may consider in appointing a guardian.  We decline to equate this spousal preference with a presumption that must be overcome in a contested guardianship proceeding.  

William contends that the trial court failed to make a determination regarding which proposed guardian would be most likely to follow the dictates of the Probate Act to promote Cindy's well-being, protect her from neglect, exploitation or abuse, and encourage development of her maximum self-reliance and independence (755 ILCS 5/11--3(b) (West 1996)) and to follow the Surrogate Act's mandate that the surrogate carry out the disabled person's wishes (755 ILCS 40/20(b)(1) (West 1996)). The gist of this argument is that, because Tom expressed a desire to withdraw life-sustaining treatment in contrast to Sheryl's expressed desire to attempt to rehabilitate Cindy, his appointment would not be in Cindy's best interest--the paramount concern in selecting a guardian. Yet, in his preceding argument regarding spousal preferences, William stated in his brief that it is undisputed that both Tom and Sheryl are qualified to act as Cindy's guardian.  

 The decision to withdraw life-sustaining treatment may very well be consistent with Cindy's best interest under the appropriate circumstances.  The law clearly permits such a decision by either the guardian or the surrogate, but only if certain criteria are met.  See 
Greenspan
, 137 Ill. 2d at 16-17; 755 ILCS 40/20 (West 1996) (setting forth the procedures to be followed in making a decision to forego life-sustaining treatment without resorting to the courts or legal process).  The trial court pointed out that those circumstances were yet to be medically certified. See 755 ILCS 40/10 (West 1996) and 755 ILCS 40/20(c) (West 1996) (the attending physician and at least one other qualified physician must determine that the patient lacks decisional capacity and has a "qualifying condition" defined as a "terminal condition," "permanent unconsciousness" or an "incurable or irreversible condition," before the surrogate decision maker may consider whether or not to forego life-sustaining treatment); see also 755 ILCS 40/25 (West 1996) (a qualified party seeking to challenge the decision of the recognized surrogate decision maker may initiate guardianship proceedings in accordance with the Probate Act of 1975).  The court considered Cindy's preference in the appointment of a guardian, namely, Tom, and her preference in not being kept alive by artificial means if she were in a vegetative state.  Tom and Mandy testified that Cindy wished them to care for her. Overall, the testimony of the remainder of the family was that Cindy would not want to live on life support--particularly if she were unable to communicate.  Notwithstanding the other relatives’ testimony regarding Tom's sometimes boorish behavior, Tom presented evidence that Cindy loved him and placed her trust in him.  Sheryl testified that Cindy loved her husband, although she was unhappy about how he treated her.  Cindy's brother Dan conceded that Cindy told him Tom loved and cared for her.  Tom testified that he would make his decisions within the dictates of the law.  Although the record discloses the apparent antipathy between Tom and some members of the family, the record reveals no fraudulent conduct or bad faith in prior dealings between Tom and Cindy that would disqualify Tom.  See 
Robertson
, 144 Ill. App. 3d at 712.  

The GAL's report indicated that Tom had taken excellent care of Cindy, and it sought to explain the parties' perceived differences in interpreting Cindy's prognosis.  Apparently, part of the confusion stemmed from the fact that, in dealing initially with the family's questions regarding Cindy's chances of recovery, Dr. Pederson chose to follow the theory of telling the family what the best scenario was that could possibly occur under the most ideal conditions.  After outlining the results of a rather extensive investigation, the GAL recommended Tom's appointment.

The trial court was faced with the difficult decision of appointing a guardian where a substantial and unfortunate difference of opinion existed between the opposing factions of Cindy's family based on their respective interpretations and perceptions of the facts and circumstances regarding Cindy's care.  We sympathize with all the members of the family in this tragic situation.  Each side appears to want what is best for Cindy in accord with its respective moral compass, and the evidence does not show otherwise.  We cannot conclude that the trial court abused its discretion in appointing Tom as the guardian of Cindy's person and estate. 

The judgment of the circuit court of McHenry County is affirmed. 

Affirmed.

GEIGER, P.J., and THOMAS, J., concur.