# Illinois Official Reports

## Appellate Court

---

### *In re Craig H.*, 2020 IL App (4th) 190061

---

| | |
|---|---|
| Appellate Court Caption | *In re* CRAIG H., a Person Found Subject to Administration of Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Craig H., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-19-0061 |
| Filed<br>Rehearing denied | April 7, 2020<br>May 28, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 18-MH-339; the Hon. Esteban F. Sanchez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Veronique Baker and Kelly R. Choate, of Guardianship and Advocacy Commission, of Springfield, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment and opinion.

## OPINION

¶ 1        Respondent, Craig H., appeals from the trial court's order finding him subject to involuntary administration of psychotropic medication pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/2-107.1 (West 2018)). He argues the court's judgment should be reversed because (1) the case falls under an exception to the mootness doctrine, (2) the trial court erred by denying respondent's motion to dismiss, and (3) the court's order for involuntary administration of psychotropic medication stripped respondent of his right to self-determination under the Powers of Attorney for Health Care Law (Powers of Attorney Law) (755 ILCS 45/4-1 *et seq.* (West 2018)) and violated both the Mental Health Code and the Powers of Attorney Law.

¶ 2        Although we conclude respondent's claim regarding involuntary administration is moot, we address respondent's claims under the capable of repetition yet evading review and the public interest exceptions to the mootness doctrine. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4        In November 2018, Dr. Aura Eberhardt, a psychiatrist at Andrew McFarland Mental Health Center (McFarland), filed a petition for administration of psychotropic medication under section 2-107.1 of the Mental Health Code (405 ILCS 5/2-107.1 (West 2018)). That same month, respondent filed a motion to dismiss the petition for involuntary treatment. Attached to the motion to dismiss was a copy of respondent's signed statutory short form power of attorney for health care. Respondent signed the power of attorney in September 2013 and named his mother, Teresa H., as his agent. The power of attorney authorized Teresa H. "to act for [respondent] and in [his] name (in any way [he] could act in person) to make any and all decisions for [him] concerning [his] personal care, medical treatment, hospitalization and health care and to require, withhold or withdraw any type of medical treatment or procedure, even though [his] death may ensue." The motion alleged a valid power of attorney existed and Teresa H. disagreed with the proposed treatment and refused to consent to administration of the proposed medications. Further, the motion alleged as follows: "Because the determination to refuse medical treatment lies with the agent, and because the agent has refused the treatment proposed in the petition, and because there is no allegation that the agent is not competent to make the decision, the court lacks the authority to countermand the decision of the agent and the petition should be dismissed."

¶ 5        On December 6, 2018, the trial court held a hearing on the motion to dismiss. The State argued section 2-107.1 was an exception to the rule of informed consent and a power of attorney extended a person's consent to another. Normally, a power of attorney's refusal of treatment would be the end of the matter, but under section 2-107.1 that "refusal doesn't carry the day, because of this sentence in 107.1 saying that this is an exception to informed consent."

The State further argued the statute allowed involuntary administration either under the provisions of section 2-107.1(a-5) or with the consent of a power of attorney under section 2-107.1(e). According to the State, there was no additional language in the statute that precluded the State from bringing a petition for involuntary medication if the power of attorney refused treatment.

¶ 6 Respondent argued the decision of a power of attorney must be honored. Further, respondent argued the Powers of Attorney Law contained a supremacy clause providing that the Powers of Attorney Law controlled if another law conflicted with its provisions. Respondent asserted that involuntary medication under section 2-107.1(a-5) was only appropriate when the patient had no mental health declaration or power of attorney.

¶ 7 The trial court acknowledged the case law shed little light on the specific issue before the court. For the reasons set forth by the State, the court denied the motion to dismiss and set the matter for a hearing on the petition for involuntary administration of psychotropic medication.

¶ 8 On December 28, 2018, the trial court held a hearing on the petition for involuntary administration. The court heard the following evidence.

¶ 9 Dr. Eberhardt testified respondent was admitted on November 29, 2016, as unfit to stand trial for a felony burglary charge in La Salle County. Dr. Eberhardt testified respondent was diagnosed with schizoaffective disorder, bipolar type, at age 25. At the time of trial respondent was 54 years old. Dr. Eberhardt described respondent's symptoms as follows:

"[Respondent] presents at this time with psychotic symptoms, consisting of hallucinations, as evidenced by him responding to hallucinations by talking to himself, talking about himself in third person, saying things like, [']Craig, don't touch food. Craig, don't sleep. Craig, you need to marry.['] He presents with paranoia. For example, he believes that his belongings are stolen. He presents with inability to sleep. He averages 1.9 hours of sleep per day. He presents with poor impulse control, hypersexuality, and psychomotor agitation. As examples, he's pacing when—the entire time when he is awake. As far as hypersexuality, I have examples where [respondent] approached female peers and female staff, trying to kiss them, trying to sniff them, standing in their door while they were sleeping at night. As far as poor impulse control, I have the examples of physical aggression."

According to Dr. Eberhardt, respondent's symptoms worsened at the end of June or beginning of July when he began to present with hypersexuality, physical aggression, irritability, and hostility. Dr. Eberhardt testified respondent lacked the capacity to make treatment decisions. When approached regarding his psychiatric illness, respondent denied having such an illness and talked about getting out of McFarland "to marry a German girl and make her rich."

¶ 10 Dr. Eberhardt opined respondent had no insight into his illness and lacked the ability to rationally weigh the pros and cons of medication. Since July 2018, respondent exhibited a deterioration of his ability to function due to his mental illness. Dr. Eberhardt testified respondent failed to sleep for days in a row, followed by days when he slept continuously and missed meals. Respondent recently began collecting urine in cups in his room and required prompts to bathe and eat.

¶ 11 In late June 2018, respondent became aggressive with a roommate who tripped him. Another peer intervened, and respondent hit him. The peer fell to the ground and went to the emergency room for stitches. In September 2018, respondent "shoved a peer to the ground

because he said he was tired of that peer." Dr. Eberhardt detailed numerous threats respondent made to kill various people, including staff. Further, Dr. Eberhardt testified about multiple aggressive incidents, including respondent threatening someone with a coffee pitcher, striking walls and windows, digging through trash, urinating on floors, and writing on walls. According to Dr. Eberhardt, respondent received emergency forced medications on at least 10 occasions in the last five months.

¶ 12   Dr. Eberhardt testified the following medications were her first choice for treating respondent: (1) risperidone to treat psychotic symptoms, including hallucinations and disorganized thinking (2 to 8 milligrams by mouth per day, or 20 to 50 milligrams intramuscular long acting every 14 days); (2) lithium to stabilize his mood (450 to 1800 milligrams per day); (3) lorazepam to treat his agitation and lack of sleep (2 to 6 milligrams per day); (4) benztropine to address possible side effects from the other medications (1 to 6 milligrams per day). According to Dr. Eberhardt, the following medications were alternatives to risperidone and had the same benefits: (1) olanzapine (10 to 30 milligrams per day); (2) clozapine (25 to 600 milligrams per day); and (3) haloperidol (10 to 40 milligrams by mouth per day, 10 to 30 milligrams intramuscular per day, or 100 to 400 milligrams intramuscular every 28 days).

¶ 13   Dr. Eberhardt testified regarding the possible side effects and risks of these medications and methods to treat the possible side effects. According to Dr. Eberhardt, respondent had been treated with these medications in the past, including clozapine, olanzapine, risperidone, and haloperidol decanoate. Respondent's symptoms improved through treatment with these medications, allowing him to live in two different nursing homes "for at least a couple of years." Dr. Eberhardt testified, "The record indicates that his mother would take him home, stop his medications, and then he would decline."

¶ 14   The State offered into evidence People's exhibit No. 1, a lengthy written document extensively detailing the benefits, side effects, and risks for the first-choice and alternative medications with which Dr. Eberhardt sought to treat respondent. Also offered into evidence was People's exhibit No. 2, which was a written document outlining alternatives to psychotropic medications. Dr. Eberhardt testified she attempted to discuss the benefits, risks, side effects, and alternative treatments with respondent and attempted to provide copies of People's exhibit Nos. 1 and 2. Respondent told Dr. Eberhardt to throw the documents away, so Dr. Eberhardt placed the written materials outlining the benefits, risks, side effects, and alternative treatments in respondent's mailbox, to which respondent always had access.

¶ 15   Dr. Eberhardt opined the benefits of the medications outweighed the potential harm from the adverse side effects. Without treatment, respondent was aggressive, hypersexual, could not take care of himself, and would be unable to live anywhere other than a hospital. With treatment, respondent could reduce his violent behavior, regain capacity, and eventually live in a nursing home.

¶ 16   Dr. Eberhardt acknowledged respondent's 82-year-old mother was his agent under the Powers of Attorney Law. Dr. Eberhardt provided Teresa H. with the written information regarding the risks, benefits, side effects, and alternative treatments. Teresa H. understood the proposed treatment, but Dr. Eberhardt believed she did not have respondent's best interest at heart. Dr. Eberhardt testified that Teresa H. did not have years of experience watching respondent take medications because she repeatedly stopped his medications. According to Dr.

Eberhardt, Teresa H. stopped respondent's medications because they caused him brain damage, made him like a zombie, and made him look "like a man without a head."

¶ 17    If respondent had capacity and refused medication, Dr. Eberhardt testified she would not file a petition with the court for involuntary medication. Dr. Eberhardt acknowledged treatment alternatives when someone with capacity refused medication included seclusion, emergency forced medication, and restraints. When asked whether any psychiatrist examined Teresa H. to determine her competency, the State objected on relevance grounds. Respondent argued the State had the burden of proving the power of attorney lacked capacity. The trial court, based on the law of the case, sustained the objection and found the issue of the power of attorney's competence was irrelevant in a petition filed under section 107.1 of the Mental Health Code.

¶ 18    Respondent's "theme date" for release from McFarland was February 28, 2018, so he would have approximately one month after the medications took effect before he was released. Dr. Eberhardt testified that untreated schizoaffective disorder worsened over time and had "an element of cycling." According to Dr. Eberhardt, respondent did not have access to a gun or vehicle with which to carry out his threats. When asked if respondent's behaviors could be addressed by less-restrictive means, Dr. Eberhardt testified emergency forced medication and restraints were a last resort. Dr. Eberhardt opined respondent would cease taking medication if he was released with his mother. If respondent ceased taking risperidone upon his release, he would not have adverse side effects. However, he could experience adverse side effects if he abruptly ceased taking clozapine and olanzapine.

¶ 19    Regarding respondent's possible release in February 2018, Dr. Eberhardt testified as follows: "The plan, as of now, is for his mother, power of attorney for health, to take him home. She indicated that she's going to lock him in his room. I know from review of records that he hit her in the emergency room. She's 82 years old. So if I continue being his psychiatrist, I would attempt to civilly commit him if he experiences these symptoms. I don't think he would be safe to be released."

¶ 20    Respondent moved for a directed verdict at the close of the State's case and the close of evidence. The trial court denied both motions. In delivering its ruling on the motion for directed verdict, the court opined that the State had proved respondent's lack of capacity and the burden should shift to respondent to prove the power of attorney had the ability to refuse medication. The court further indicated its position that the mere existence of a power of attorney did not end the inquiry when the agent's actions were questionably unreasonable. The court granted the petition for involuntary administration of psychotropic medication, which expired on its own terms 90 days later.

¶ 21    This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, respondent argues the court's judgment should be reversed because (1) the case falls under an exception to the mootness doctrine, (2) the trial court erred by denying respondent's motion to dismiss, and (3) the court's order for involuntary administration of psychotropic medication stripped respondent of his right to self-determination under the Powers of Attorney Law (755 ILCS 45/4-1 *et seq.* (West 2018)) and violated both the Mental Health Code and the Powers of Attorney Law.

## A. Mootness

The December 28, 2018, involuntary-administration order expired on its own terms 90 days after it was entered; accordingly, the appeal of this order is moot. "As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351, 910 N.E.2d 74, 78 (2009). However, we will consider an otherwise moot case where it falls under a recognized exception. Here, respondent argues his case falls into two of the mootness exceptions: (1) the capable-of-repetition-yet-evading-review exception and (2) the public interest exception. See *id.* This court considers these exceptions on a case-by-case basis. *Id.* at 354. "All of the exceptions to the mootness doctrine are 'to be construed narrowly and require a clear showing of each criterion to bring the case within the terms.' " *In re Sharon H.*, 2016 IL App (3d) 140980, ¶ 20, 52 N.E.3d 698 (quoting *In re J.T.*, 221 Ill. 2d 338, 350, 851 N.E.2d 1, 8 (2006)).

### 1. *Capable-of-Repetition-Yet-Evading-Review Exception*

An exception to the mootness doctrine exists for cases where the events are capable of repetition yet are of such a short duration as to evade review. *J.T.*, 221 Ill. 2d at 350. "This exception has two elements. First, the challenged action must be of a duration too short to be fully litigated prior to its cessation. Second, there must be a reasonable expectation that 'the same complaining party would be subjected to the same action again.' " *Alfred H.H.*, 233 Ill. 2d at 358 (quoting *In re Barbara H.*, 183 Ill. 2d 482, 491, 702 N.E.2d 555, 559 (1998)). The "same action" need not be identical, but "the actions must have a substantial enough relation that the resolution of the issue in the present case would be likely to affect a future case involving respondent." *Id.* at 359.

There is no question the first criterion has been met, as the involuntary-medication order expired by its own terms in 90 days, and appellate review could not have taken place prior to its expiration. See *id.* Respondent has also met the second criterion. Respondent challenges the interpretation of both the Mental Health Code and the Powers of Attorney Law, and his power of attorney and demonstrated history of mental health issues show the resolution of this issue will likely affect a future case involving respondent. See *id.* at 360 ("[T]here must be a substantial likelihood that the issue presented in the instant case, and any resolution thereof, would have some bearing on a similar issue presented in a subsequent case.").

### 2. *Public Interest Exception*

"Application of the public interest exception requires (1) the existence of a question of public importance; (2) the desirability of an authoritative determination for the purpose of guiding public officers in the performance of their duties; and (3) the likelihood that the question will recur." *J.T.*, 221 Ill. 2d at 350. Respondent argues his claims raise questions of public importance and there is a need for an authoritative determination to guide public officers. We agree. Our research has revealed no cases considering the question of whether the State may pursue a petition for involuntary administration of psychotropic medication where a power of attorney refused to consent to the treatment. As respondent's claim raises an issue of first impression, we conclude the public interest exception to the mootness doctrine applies, and we address his claims. See *In re Shelby R.*, 2013 IL 114994, ¶¶ 19-22, 995 N.E.2d 990 (discussing cases where the public interest exception to the mootness doctrine applied to issues

of first impression).

¶ 31                                    B. Mental Health Code

¶ 32      Respondent argues that the trial court erred by denying his motion to dismiss and that the court's order for involuntary administration of psychotropic medication stripped respondent of his right to self-determination under the Powers of Attorney Law (755 ILCS 45/4-1 *et seq.* (West 2018)) and violated both the Mental Health Code and the Powers of Attorney Law.

¶ 33      Respondent first contends the trial court erred by denying his motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2018)). A section 2-619 motion to dismiss admits the legal sufficiency of the complaint but asserts that defects, defenses, or other affirmative matters on the face of the complaint avoid or defeat the claims. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59, 857 N.E.2d 229, 236 (2006). The denial of a section 2-619 motion to dismiss presents a question of law that we review *de novo*. *Id.*

¶ 34      Respondent next contends the trial court's order for involuntary administration of psychotropic medication violated both the Powers of Attorney Law and the Mental Health Code. Resolution of both these claims requires addressing respondent's argument that the power of attorney's refusal of treatment precluded the State from bringing a petition for voluntary treatment. Accordingly, we turn first to the Mental Health Code.

¶ 35      Statutory construction presents a question of law, which as discussed above we review *de novo*. *Id.* "The primary objective of this court when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature." *Id.* The plain language is the most reliable indication of the legislature's intent. *Id.* When the statutory language is clear, it is applied as written without resort to tools of statutory construction. *Id.*

¶ 36      If, however, the statutory language is ambiguous, we may employ tools of statutory construction to ascertain the meaning of a statute. *Id.* We may consider similar and related statutes, although not strictly *in pari materia*. *Id.* at 59-60. "We must presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious." *Id.* at 60. "A fundamental principle of statutory construction is to view all provisions of a statutory enactment as a whole. Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *Id.* We presume the legislature did not intend absurdity, inconvenience, or injustice. *Id.*

¶ 37      Section 2-102(a-5) of the Mental Health Code provides, in part, as follows:

> "If the services include the administration of electroconvulsive therapy or psychotropic medication, the physician or the physician's designee shall advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated. The physician shall determine and state in writing whether the recipient has the capacity to make a reasoned decision about the treatment. The physician or the physician's designee shall provide to the recipient's substitute decision maker, if any, the same written information that is required to be presented to the recipient in writing. If the recipient lacks the capacity to make a reasoned decision about the treatment, the treatment may be administered only (i) pursuant to the provisions of Section 2-107 or 2-107.1 or (ii) pursuant to a power of

attorney for health care under the Powers of Attorney for Health Care Law or a declaration for mental health treatment under the Mental Health Treatment Preference Declaration Act." 405 ILCS 5/2-102(a-5) (West 2018).

Section 2-107.1 of the Mental Health Code allows for the filing of a petition for involuntary administration of psychotropic medication. In relevant part, it states,

"The petition shall state that the petitioner has made a good faith attempt to determine whether the recipient has executed a power of attorney for health care under the Powers of Attorney for Health Care Law or a declaration for mental health treatment under the Mental Health Treatment Preference Declaration Act and to obtain copies of these instruments if they exist. If either of the above-named instruments is available to the petitioner, the instrument or a copy of the instrument shall be attached to the petition as an exhibit." *Id.* § 2-107.1(a-5)(1).

Section 2-107.1(a-5)(1) also requires providing a copy of the petition and notice of the hearing "to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, and the guardian, if any." *Id.*

¶ 38        Based on the plain language of the provisions in the Mental Health Code, the existence of a power of attorney does not preclude the State from filing a petition for the involuntary administration of psychotropic medication. First, if the treating physician determines respondent lacks capacity to make a rational decision regarding treatment, "the treatment may be administered only (i) pursuant to the provisions of Section 2-107 or 2-107.1 or (ii) pursuant to a power of attorney for health care under the Powers of Attorney for Health Care Law or a declaration for mental health treatment under the Mental Health Treatment Preference Declaration Act." *Id.* § 2-102(a-5). This language indicates two circumstances in which the respondent may be subject to involuntary medication—first, according to the provisions of section 2-107.1 and second, according to the decision of a power of attorney or the terms of a declaration for mental health treatment. The use of the disjunctive "or" indicates involuntary medication can be administered either under a section 2-107.1 petition *or* when authorized by a power of attorney. Nothing in the plain language indicates the decision by a power of attorney precludes the filing of a section 2-107.1 petition.

¶ 39        This reading of the statute is supported by the statutory provision that allows a guardian to consent to involuntary medication over objection by the recipient only if the strictures of section 2-107.1(a-5) are followed. Respondent's assertion in his reply brief—that the statute only allows a guardian to consent to treatment to which the recipient does not object—is misleading. The statute specifically states that "[a] guardian may be authorized to consent to the administration of psychotropic medication or electroconvulsive therapy to an *objecting* recipient *only under the standards and procedures of subsection (a-5)*." (Emphases added.) *Id.* § 2-107.1(b). The statute does allow a guardian to consent to administration of medication for an *unobjecting* recipient *without* the procedural hurdles required by section 2-107.1(a-5) of the Mental Health Code. Conversely, the statute allows for the administration of psychotropic medication pursuant to a power of attorney over the objection of the recipient. See *id.* § 2-107.1(e). The statute is silent as to the administration of medication over the objection of the power of attorney. This makes sense because section 2-107.1(a-5) controls in that situation— if the State seeks to involuntarily administer medication, it must comply with the due process protections laid out in that section.

¶ 40    Moreover, the plain language of section 2-107.1(a-5) anticipates the filing of a petition for involuntary administration of psychotropic medication. The statute requires the petitioner to make a good faith effort to determine whether a power of attorney exists and to attach a copy of the instrument (if available) to the petition. If the existence of a power of attorney were enough to support a motion to dismiss under section 2-619 of the Code of Civil Procedure or prevent the entry of an involuntary administration order, this statutory requirement makes no sense. Instead the statute would provide for the preclusion of such a petition upon the discovery of the power of attorney. Rather, the statute contemplates the filing of an involuntary medication petition where the respondent has a power of attorney, and it allows for such a petition to proceed only in accordance with the procedural requirements of section 2-107.1(a-5).

¶ 41    Our construction of the Mental Health Code does not end the inquiry. We must also consider whether the provisions of the Powers of Attorney Law impact the judgment in this case. Accordingly, we turn to the statutory provisions governing the powers of attorney.

¶ 42    The Powers of Attorney Law includes a "[p]urpose" provision that, in part, states, "The General Assembly recognizes the right of the individual to control all aspects of his or her personal care and medical treatment, including the right to decline medical treatment or to direct that it be withdrawn, even if death ensues." 755 ILCS 45/4-1 (West 2018). In outlining the duties of healthcare providers in relation to healthcare agencies, the Powers of Attorney Law states "[w]henever a provider believes a patient may lack capacity to give informed consent to health care which the provider deems necessary, the provider shall consult with any available health care agent known to the provider who then has power to act for the patient under a health care agency." *Id.* § 4-7(a). Under the statutory short form power of attorney for healthcare provision, the statutory health care power includes, unless specifically excluded in the instrument, the following: "The agent is authorized to give consent to and authorize or refuse, or to withhold or withdraw consent to, any and all types of medical care, treatment or procedures relating to the physical or mental health of the principal, including any medication program, surgical procedures, life-sustaining treatment or provision of food and fluids for the principal." *Id.* § 4-10(c)(1).

¶ 43    Finally, the Powers of Attorney Law includes a supremacy clause that provides as follows:

> "This Article applies to all health care providers and other persons in relation to all health care agencies on and after the effective date of this Article. This Article supersedes all other Illinois Acts or parts thereof existing on the effective date of this Article to the extent such other Acts are inconsistent with the terms and operation of this Article; provided, that this Article does not affect the law governing emergency health care. If the principal has a living will under the 'Illinois Living Will Act', as now or hereafter amended, the living will shall not be operative so long as an agent is available who is authorized by a health care agency to deal with the subject of life-sustaining or death-delaying procedures for and on behalf of the principal." *Id.* § 4-11.

¶ 44    The plain language of the Powers of Attorney Law suggests that an agent has the unlimited power to make health care decisions for a person. The supremacy clause indicates that any conflict with any other law should be resolved in favor of the power of attorney. Respondent criticizes the State's failure to cite any authority challenging the supremacy clause; however, our research revealed only two cases that reference this provision, and neither addresses the Mental Health Code. See *In re Estate of Greenspan*, 137 Ill. 2d 1, 19, 558 N.E.2d 1194, 1202-

03 (1990) ("[I]f the principal under a health care power also has a living will, the living will shall not be operative so long as the agent under the power is available to act [citation]."); *In re Estate of Longeway*, 133 Ill. 2d 33, 54, 549 N.E.2d 292, 302 (1989) ("[T]he Powers of Attorney for Health Care Law specifically provides that that law prevails over all inconsistent acts and '[i]f the principal has a living will *** the living will shall not be operative so long as an agent is available who is authorized by a health care agency to deal with the subject of life-sustaining or death-delaying procedures for and on behalf of the principal.' ").

¶ 45       Although the supremacy clause employs broad language declaring it supersedes all other acts to the extent the other acts are inconsistent, this does not preclude the State from filing a petition for involuntary administration of psychotropic medication. As the State correctly points out, it has both a *parens patriae* interest in providing for those suffering from mental illness and lacking capacity to make reasoned treatment decisions and a penological interest in restoring respondent to fitness to stand trial. *In re C.E.*, 161 Ill. 2d 200, 217, 641 N.E.2d 345, 353 (1994) ("We believe that section 2-107.1 embodies this State's significant *parens patriae* interest in providing for persons who, while suffering from a serious mental illness or developmental disability, lack the capacity to make reasoned decisions concerning their need for medication."); *Sell v. United States*, 539 U.S. 166, 179 (2003) ("[T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.").

¶ 46       Moreover, "where there are two statutory provisions, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one subject, the particular provision must prevail." *Village of Chatham v. County of Sangamon*, 216 Ill. 2d 402, 431, 837 N.E.2d 29, 46 (2005). Here, the Mental Health Code specifically addresses involuntary treatment, and it anticipates a petition even in cases where the respondent has a power of attorney. The language of the Mental Health Code does not require a power of attorney to acquiesce to treatment before the court can order it. See 405 ILCS 5/2-107.1(a-5) (West 2018). Based on the plain language of the Mental Health Code, we conclude the State may file a petition for involuntary administration of psychotropic medication even where respondent has a power of attorney. Respondent does not otherwise challenge the court's order under section 2-107.1(a-5). Accordingly, we conclude the trial court's order for involuntary medication was proper, and we affirm the judgment of the court.

¶ 47                                      III. CONCLUSION
¶ 48       For the reasons stated, we affirm the judgment of the trial court.

¶ 49       Affirmed.